**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

RIO GRANDE FOUNDATION and
ILLINOIS OPPORTUNITY
PROJECT,

      Plaintiffs,

v.                                                                No. Civ. 1:19-cv-01174-JCH-JFR

MAGGIE TOULOUSE OLIVER, in her
official capacity as Secretary of State
of New Mexico,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

On August 25, 2020, Plaintiffs Rio Grande Foundation ("RGF") and Illinois Opportunity Project ("IOP") (collectively, "Plaintiffs") filed a *Motion for Preliminary Injunction and Memorandum of Law in Support Thereof* (ECF No. 33). To protect their First Amendment rights, Plaintiffs request a preliminary injunction to enjoin Defendant Secretary of State of State of New Mexico Maggie Toulouse Oliver ("Defendant") from applying 2019 Senate Bill 3 to Plaintiffs by requiring them to disclose certain financial supporters and to expressly state their respective group's sponsorship on the political mailings they intend to send within 60 days of the November 3, 2020 election. For purposes of this motion, Plaintiffs are only seeking "an order protecting their specific organizations (an as-applied challenge)." Pls.' Mot. 6-7, ECF No. 33. The parties indicated that an evidentiary hearing on the motion is not necessary for the Court's resolution of the motion. *See* Order, ECF No. 34, *and* Court's Docket Sheet. The Court, having considered the motion, briefs, evidence, and applicable law, concludes that the motion for preliminary injunction should be denied.

## I.      FACTUAL BACKGROUND

**A. Illinois Opportunity Project and its statewide mailings on a New Mexico referendum**

Plaintiff IOP is a 501(c)(4) social-welfare organization based in Illinois that engages in issue advocacy, educating the public in Illinois and other states about policy that is driven by the principles of liberty and free enterprise. Decl. of Matthew Besler ¶¶ 1, 3-4, ECF No. 33-1. IOP works on issues that are strongly opposed by public-employee labor unions, including collective-bargaining reform, pension reform, and school choice. *Id.* ¶ 15. IOP also is directly critical of some public officials, such as the Illinois governor and speaker of the house. *Id.* ¶ 16. IOP intends to spend over $9,000 on mailings to thousands of New Mexico voters within 60 days of the 2020 general election. *Id.* ¶ 6. The mailings will mention the upcoming referendum on amending the New Mexico Constitution to end elections for the New Mexico Public Service Commission and provide information about the American tradition of governmental accountability to voters. *Id.*

According to its 2018 IRS Form 990, IOP has a budget over $3 million.[1] IOP receives general-fund support from a variety of sources, including donations over $5,000 in a single contribution or over $5,000 total in a two-year cycle. *Id.* ¶ 8. IOP protects donor privacy and does not publicly disclose their donors. *Id.* ¶ 9. IOP fears that disclosure of its members, supporters and donors may subject them to official retaliation or to retaliation and harassment by intolerant elements of society. *Id.* ¶¶ 10-11. Based on his fundraising experience, Matthew Besler, the president and a board member of IOP, believes that donors will be less likely to contribute to the IOP and he knows of several donors who would discontinue their support if they were subject to disclosure. *Id.* ¶¶ 2, 12. IOP is concerned that disclosure would change the focus from its message

---

[1] *See* IRS, Tax Exempt Organization Search,
https://apps.irs.gov/app/eos/displayAll.do?dispatchMethod=displayAllInfo&Id=878922&ein=273627386&country=
US&deductibility=all&dispatchMethod=searchAll&isDescending=false&city=&ein1=&postDateFrom=&exemptTy
peCode=al&submitName=Search&sortColumn=orgName&totalResults=1&names=Illinois+Opportunity+Project&r
esultsPerPage=25&indexOfFirstRow=0&postDateTo=&state=All+States (last visited Oct. 8, 2020) (2018 990O
Filing at 1).

to the people paying for the message and that it will lose donors. *See id.* ¶¶ 13-14, 20. Based on the experience of other organizations, including those that have taken on public employee unions and have supported economic-liberty candidates who in turn support traditional marriage, IOP fears its donors may be subject to retaliation by union interests, harassment by activists, and negative responses by government officials who it criticizes and that it will lose donors as a result of the fear of retaliation. *See id.* ¶¶ 17-20.

### B. Rio Grande Foundation and its legislative scorecard for legislative districts

Plaintiff RGF is a 501(c)(3) charitable and educational organization based in New Mexico whose mission is to inform New Mexicans of the importance of individual freedom, limited government, and economic opportunity. *See* Decl. of Paul Gessing ¶ 1, ECF No. 33-2. RGF engages in issue advocacy in New Mexico on issues related to its mission, including collective-bargaining reform, pension reform, school choice, right-to-work legislation, the Second Amendment, opposition to renewable portfolio mandates, and criticism/skepticism of climate change. *See id.* ¶¶ 14-16. RGF has been critical of the New Mexico governor and New Mexico legislators, including questioning the State's COVID-19 mandates. *Id.* ¶ 17.

RGF publishes a "Freedom Index" that tracks New Mexico state legislators' floor votes on bills important to RGF. *Id.* ¶ 5. RGF posted on its website its "Freedom Index" scorecards from 2015-20. *See* Rio Grande Foundation, http://riograndefoundation.org/legislative-scorecard/#/ (last visited Oct. 8, 2020). Prior to the November 3, 2020 election, RGF plans to publicize the results of its "Freedom Index" using mailings that will mention the name of incumbent legislators and provide information about his or her votes and score on the Freedom Index. Gessing Decl. ¶ 5,

ECF No. 33-2. RGF will spend over $3,000 in individual legislative districts for paid communications by mail to thousands of New Mexico voters within 60 days of the election. *Id.*[2]

RGF receives general-fund support from multiple sources, including donations over $5,000 in a single contribution or over $5,000 total in a two-year cycle. *Id.* ¶ 7. With one exception, RGF's list of members, supporters, and donors is private. *Id.* ¶ 8. Like IOP, RGF fears that if it must disclose its donors, they may be subject to official retaliation or to retaliation and harassment by intolerant elements of society, including boycotts, online harassment, and social ostracism. *See id.* ¶¶ 9-10. RGF particularly fears retaliation by union interests, harassment by activists who oppose the issues RGF supports, and negative responses by government officials. *See id.* ¶¶ 18-21. According to Paul Gessing, RGF's president and chief executive officer, he is aware of at least one past instance where individuals or organizations affiliated with certain causes or candidates in New Mexico were threatened with or experienced retaliation from other public leaders. *Id.* ¶¶ 2, 9. Based on his fundraising experience, Mr. Gessing believes that some donors would not continue to do so if subject to disclosure. *Id.* ¶¶ 11, 22.

### C. 2019 Senate Bill 3's changes to New Mexico's Campaign Reporting Act

In 2019, Senate Bill 3 became law, expanding the definition of "independent expenditure" to include an expenditure "made to pay for an advertisement that … refers to a clearly identified candidate or ballot question and is published and disseminated to the relevant electorate in New Mexico within thirty days before the primary election or sixty days before the general election at which the candidate or ballot question is on the ballot." N.M. Stat. Ann. § 1-19-26(N)(3)(c).[3]

---

[2] Although Gessing's Declaration states that "IOP plans to spend over $3,000" on the Freedom Index mailings, the Court presumes this is an error and should have referred to RGF based on the context of the totality of the Declaration. *See* Gessing Decl. ¶ 5, ECF No. 33-2.

[3] "Independent expenditures" also cover expenditures for an advertisement that "expressly advocates the election or defeat of a clearly identified candidate or the passage or defeat of a clearly identified ballot question," N.M. Stat. Ann. § 1-19-26(N)(3)(a), and that "is susceptible to no other reasonable interpretation than as an appeal to vote for or against a clearly identified candidate or ballot question," *id.* § 1-19-26(N)(3)(b). These provisions are designed to cover

Senate Bill 3 also enacted a new section of the Campaign Reporting Act that added reporting requirements for independent expenditures not otherwise required to be reported. *See id.* § 1-19-27.3(A); 2019 New Mexico Laws Ch. 262 (S.B. 3), Sec. 1(A). A person who makes independent expenditures of more than $9,000 in a statewide election or more than $3,000 in a non-statewide election "exclusively from a segregated bank account consisting only of funds contributed to the account by individuals to be used for making independent expenditures" must report the name, address, and amount of each contribution made by each contributor who gave more than $200 to the segregated bank account in the election cycle. N.M. Stat. Ann. § 1-19-27.3(D)(1). If the expenditures were made from a general fund (not a segregated bank account), a person who makes independent expenditures of more than $9,000 in a statewide election or more than $3,000 in a non-statewide election must report the name, address, and amount of each contribution made by each contributor who gave more than $5,000 to the person during an election cycle. *See id.* § 1-19-27.3(D)(2). For contributors of more than $5,000 to a general fund, the disclosure rules do not apply "if the contributor requested in writing that the contribution not be used to fund independent or coordinated expenditures or to make contributions to a candidate, campaign committee or political committee." *Id.*

Further, Senate Bill 3 added another new section to the Campaign Reporting Act regarding disclaimers in advertisements. *See* 2019 New Mexico Laws Ch. 262 (S.B. 3), Sec. 2. A person making an independent expenditure for an advertisement exceeding $1,000 must include in the advertisement "the name of the candidate, committee, or other person who authorized and paid for the advertisement." N.M. Stat. Ann. § 1-19-26.4. The disclosures are searchable on the Secretary of State's website by the public. *See* Secretary of State, Independent Expenditure,

---

express advocacy and its functional equivalent. *See Wisconsin Right to Life, Inc v. Barland*, 751 F.3d 804, 838 (7th Cir. 2014); *Free Speech v. Federal Election Com'n*, 720 F.3d 788, 793-95 (10th Cir. 2013).

https://portal.sos.state.nm.us/IESearch/ (last visited Oct. 8, 2020). A person who violates the Campaign Reporting Act may be punished by a fine of not more than $1,000 or by imprisonment for not more than a year or both. N.M. Stat. Ann. § 1-19-36(A).

Consequently, IOP and RGF, groups that intend engage in issue advocacy within 60 days of the November 3, 2020 general election and who intend to spend, respectively, more than $9,000 on statewide and $3,000 on non-statewide mailings to New Mexico voters, are subject to the disclosure and disclaimer requirements of the Campaign Reporting Act. Plaintiffs assert that, by requiring them to disclose their financial supporters and identify themselves in their mailings, Defendant violates their First and Fourteenth Amendment rights. *See* Am. Compl. ¶¶ 37-44, ECF No. 13. Plaintiffs move the Court for a preliminary injunction, arguing that, if one is not granted, they will be forced to decide between silencing their speech or losing their privacy, being compelled to engage in certain speech, and exposing their donors to the risks of harassment, protests, and other threats.

## II.    PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an extraordinary remedy that should only be granted if the movant carries the burden of showing a right to relief that is clear and unequivocal. *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016); *Schrier v. University of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005). To obtain a preliminary injunction the moving party must demonstrate four elements: (1) a substantial likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest. *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

The movant, however, must satisfy a heightened burden if the requested preliminary injunction is one of three disfavored types "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc). These disfavored injunctions include: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover after a full trial on the merits. *Id.* "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor." *Mrs. Fields*, 941 F.3d at 1232 (*Free the Nipple–Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019)). As for the first disfavored injunction, the Tenth Circuit has indicated that the status quo refers to the status existing before the enaction of a challenged law. *See Free the Nipple-Fort Collins*, 916 F.3d at 798 n. 3 (in dicta, discussing with approval 11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948 (3d ed. & Nov. 2018 update) for its definition of the status quo as "the last peaceable uncontested status existing between the parties before the dispute developed" and stating that status quo "would be the status existing before Fort Collins enacted the challenged public-nudity ordinance"). The parties here agree that this case does not involve the second type of disfavored injunction, a mandatory injunction. The third injunction is met if the effect of the injunction, once complied with, cannot be undone; in other words, figuratively, one cannot put the toothpaste back in the tube. *Free the Nipple-Fort Collins*, 916 F.3d at 798 n.3 (citing with approval *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246–50 (10th Cir. 2001)).

Plaintiffs argue that the heightened standard applies because the requested preliminary injunction alters the status quo and would afford Plaintiffs all the relief they could get on their as-

applied challenge. Defendants disagree, asserting that their requested injunction does not alter the status quo that was in place before Senate Bill 3 passed, nor does it give full relief, because they assert facial challenges to the law as well. The Court, however, need not definitively determine whether the heightened standard applies, because on this record Plaintiffs cannot meet their burden using the traditional standard, let alone a heightened one.

## III.   ANALYSIS

This case presents colliding interests of constitutional significance – a person's or group's right to speak anonymously and donate to support speech anonymously on political issues against the electorate's right to know who is spending money and speaking to advocate for or against candidates or ballot measures. On the one hand, encouraging discourse and testing the merits of a person's or group's thoughts and arguments in the court of public opinion is essential to a functioning democracy, and the source of the message should carry less weight than the merits of the ideas. As the Supreme Court stated, "[a]nonymity … provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent." *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 342 (1995).[4] Anonymity also enables speakers concerned for their own safety, economic security, or social standing to speak on issues without concern that they may incur personal or financial harm from opponents of their speech. The First Amendment protects unpopular individuals from retaliation and the suppression of their ideas by an intolerant society. *Id.* at 357. "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP v. Alabama*, 357 U.S. 449, 462

---

[4] Notably, James Madison, Alexander Hamilton, and John Jay published *The Federalist* anonymously so that readers would evaluate the arguments on the merits. *See Majors v. Abell*, 361 F.3d 349, 357 (7th Cir. 2004) (J. Easterbrook, dubitante).

(1958). "[F]orbidding anonymous political advertising reduces the amount of political advertising because some would-be advertisers are unwilling to reveal their identity." *Majors v. Abell*, 361 F.3d 349, 352 (7th Cir. 2004).

On the other hand, bringing more transparency and informing the electorate of special interests seeking to influence candidate elections or ballot measures helps citizens evaluate who stands to gain and lose from the election or defeat of candidates or from proposed legislation. State and local governments have passed disclosure requirements to try to limit the impact of "dark money" and the disproportionate effect that wealthy individuals or entities may have on an election. As the Supreme Court noted in a case in which it upheld a corporation's right to spend money to publicize its views on a ballot question, "[i]dentification of the source of advertising may be required as a means of disclosure, so that people will be able to evaluate the arguments to which they are being subjected." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 767-69, 792 n.32 (1978).

Plaintiffs contend that the campaign disclosure laws invade their rights to anonymity and privacy, chilling their speech because of the "cancel" or "call-out" culture.[5] They assert that forced disclosure of their donors will result in fewer donations to their organizations, and thus, limit their speech. According to Plaintiffs, because they are substantially likely to prevail on their First Amendment claims, a preliminary injunction is necessary to protect their organization and donor privacy so that they can proceed with their pre-election mailings without fear of retribution.

### A.  RGF and IOP Have Not Satisfied their Burden of Showing a Substantial Likelihood of Success on the Merits

---

[5] According to dictionary.com, "cancel culture" refers to withdrawing support for persons or companies after they have done or said something considered objectionable or offensive. *See* https://www.dictionary.com/e/pop-culture/cancel-culture/?itm_source=parsely-api (last visited Sept. 30, 2020).

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Discussion of public issues and debate on the merits of candidates for political office are essential to the operation of democracy. *See Buckley v. Valeo*, 424 U.S. 1, 14 (1976); *Republican Party of New Mexico v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013). The First Amendment provides fundamental protections against contribution and expenditure limitations for political campaigns. *King*, 741 F.3d at 1092 ("the financing and spending necessary to enable political speech receives substantial constitutional protection"). Unlike restrictions on campaign spending, disclosure and disclaimer requirements "impose no ceiling on campaign-related activities and do not prevent anyone from speaking." *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 366 (2010) (internal citations and quotations omitted). Accordingly, the Supreme Court in *Citizens United* held that the "Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether." *Id.* at 319. "[D]isclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Buckley*, 424 U.S. at 68.

The First Amendment also protects political association, as group association may enhance effective advocacy. *Id.* at 15 (quoting *NAACP*, 357 U.S. at 460). Compelled disclosure may seriously infringe on the rights to associational privacy and belief guaranteed by the First Amendment. *Id.* at 64. Concerns about squelching speech through compelled disclosures arises not only from direct government action but also indirect action from private citizens. *See id.* at 65. Compelled disclosures must survive exacting scrutiny – there must be a substantial relationship between the governmental interest and the information that must be disclosed. *Id.* at 64. *See also Citizens United*, 558 U.S. at 366-67. "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Doe v. Reed*,

561 U.S. 186, 196 (2010) (internal quotations omitted).

### 1. New Mexico has an interest in informing the electorate of the source of significant funding for mailed advertisements referring to candidates or referendums shortly before an election

In *Buckley*, the Supreme Court upheld disclosure requirements for contributions and expenditures for candidates and political committees seeking to influence the nominations or elections of candidates. *See* 424 U.S. at 60-72. The plaintiff in *Buckley* challenged the federal disclosure laws that required political committees to register as such and keep detailed records, including the name and address of everyone making a contribution in excess of $10, along with the date and amount of the contribution; and if a person's contributions totaled more than $100, the reports must include the person's occupation and principal place of business. *Id.* at 63. The Supreme Court concluded that disclosure directly serves three substantial governmental interests. *See id.* at 60-72. First, disclosure gives voters information to aid them in evaluating candidates and the interests to which candidates may be most responsive. *See id.* at 66-67. Second, disclosure helps deter actual corruption and the appearance of corruption by helping citizens detect post-election favors. *Id.* at 67. Third, the reporting requirements gather the data needed to detect violations of contribution limits. *Id.* at 67-68.

In this case, the parties focus on the informational interest, which the Tenth Circuit held is the only interest at play for issue advocacy, which does not involve the risk of quid pro quo corruption. *See Sampson v. Buescher*, 625 F.3d 1247, 1255-56 (2010). Issue advocacy involves communications about public issues more generally, even if they mention a candidate, while express advocacy involves communications that expressly advocate for the election or defeat of a clearly identified candidate. *See Federal Election Com'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 456-57, 469-71 (2007); *Delaware Strong Families v. Attorney Gen. of Delaware*, 793 F.3d 304, 308 (3d Cir. 2015). The parties appear to agree that the constitutional issue here pertains to

issue advocacy, rather than express advocacy. Indeed, IOP's mailings pertain to a referendum on amending the New Mexico Constitution to end elections for the New Mexico Public Service Commission and will provide information about the American tradition of governmental accountability to the voters. Besler Decl. ¶ 6, ECF No. 33-1. Although the Freedom Index, a scorecard about specific legislators' votes, will mention incumbent legislators by name, it is informational issue advocacy, not express advocacy for or against a specific candidate. *Cf. Delaware Strong Families*, 793 F.3d at 309 ("By selecting issues on which to focus, a voter guide that mentions candidates by name and is distributed close to an election is, at a minimum, issue advocacy.").

The Supreme Court recognized the informational interest in disclosures of contributions designed to influence elections and in disclaimers stating the name of the person or group funding the advertisement. *See Citizens United*, 558 U.S. at 371 (transparency regarding who is making corporate speech "enables the electorate to make informed decisions and give proper weight to different speakers and messages"). In *Citizens United*, the plaintiff disputed that an informational interest justified the disclaimer and disclosure provisions because it merely sought to air an advertisement that referred to then-Senator Clinton by name to promote the movie *Hillary*. *See id.* at 367-68. Although the Supreme Court concluded the ads fell within the federal definition of an "electioneering communication," it rejected the contention that disclosure requirements for independent expenditures should be limited to express advocacy and its functional equivalent. *Id.* at 368-69. Instead, even though the ads "only pertain to a commercial transaction," the Supreme Court concluded "the public has an interest in knowing who is speaking about a candidate shortly before an election." *Id.* at 369. Lower courts have construed this language in *Citizens United* as signifying that its holding is not limited to political advertising that is the functional equivalent of a federal electioneering communication. *See, e.g., Yamada v. Snipes*, 786 F.3d 1182, 1203 (9th

Cir. 2015) ("nothing in *Citizens United* suggests that a state may not require disclaimers for political advertising that is not the functional equivalent of a federal electioneering communication").

Numerous circuit courts have extended *Citizens United* to some forms of issue advocacy before an election. According to the First Circuit, there is an equally compelling interest in identifying speakers behind political messages because citizens "rely ever more on a message's source as a proxy for reliability and a barometer of political spin." *National Organization for Marriage v. McKee*, 649 F.3d 34, 57 (2011). Relying on *Citizens United*, the First Circuit concluded that "the distinction between issue discussion and express advocacy has no place in First Amendment review of these sorts of disclosure-oriented laws." *Id.* at 54-55. The Seventh Circuit also recognized the governmental interest in knowing the speakers or funders behind issue advocacy: "the quality of the political advertising … is enhanced because the advertising contains additional information useful to the consumer" and "a speaker's credibility often depends crucially on who he is." *Majors*, 361 F.3d at 352. *See also Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010) ("Given the Court's analysis in *Citizens United*, and its holding that the government may impose disclosure requirements on speech, the position that disclosure requirements cannot constitutionally reach issue advocacy is unsupportable.").

The Seventh Circuit also more specifically determined there is a governmental interest in educating voters in initiative and referenda elections on the source of messages promoting or opposing ballot measures. *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 480 (7th Cir. 2012). As the Seventh Circuit explained when discussing initiative elections:

> [V]oters act as legislators, while interest groups and individuals advocating a measure's defeat or passage act as lobbyists. In an initiative campaign, average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest. Because the issues can be complex and the public debate confusing,

voters' interest in knowing the source of messages promoting or opposing ballot measures is especially salient in such campaigns.

Disclosure laws are substantially related to the public's interest in information during ballot initiative campaigns. Research shows that one of the most useful heuristic cues influencing voter behavior in initiatives and referenda is knowing who favors or opposes a measure. Because nominally independent political operations can hide behind misleading names to conceal their identity, often only disclosure of the *sources* of their funding may enable the electorate to ascertain the identities of the real speakers.

*Id.* at 480-81 (internal citations, quotations, and footnote omitted). The Seventh Circuit consequently concluded that Illinois's disclosure laws, which covered persons who made independent expenditures of more than $3,000 in a year for electioneering communications that refer to a clearly identified ballot question with an appeal to vote for or against the ballot issue shortly before an election, were substantially related to the state's "strong" informational interest in maintaining an informed electorate. *Id.* at 472, 480-83.[6]

The Tenth Circuit, however, has taken a more measured view in its assessment of the value of disclosure laws to ballot initiative voters, summarizing the Supreme Court's view of disclosure in ballot-issue campaigns as "such disclosure has some value, but not that much." *Sampson*, 625 F.3d at 1257. The Tenth Circuit explained that the interest diminishes substantially as the amount of monetary support a donor gives falls to a negligible level. *Id.* at 1259-60; *Coalition for Secular Government v. Williams*, 815 F.3d 1267, 1278 (10th Cir. 2016) ("the strength of the public's interest in issue-committee disclosure depends, in part, on how much money the issue committee has raised or spent"). It has, nevertheless, found such an informational interest in issue-committee disclosures, but that at a $3,500 contribution level for a statewide ballot initiative, the Tenth Circuit

---

[6] In interpreting *Citizens United*, the Seventh Circuit subsequently clarified that "nothing in *Citizens United* suggests that the Court was tossing out the express-advocacy limitation for *all* disclosure systems, no matter how burdensome;" instead, *Citizens United* lifted the express-advocacy limitation in the limited context of "event-driven disclosure for federal electioneering communications—large broadcast ad buys close to an election." *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 836 (7th Cir. 2014).

determined that the interest was not substantial. *See Williams*, 815 F.3d at 1278.

Where issue speech mentions a candidate shortly before an election, the Tenth Circuit has upheld disclosure requirements when they are sufficiently well-tailored. *See Independence Institute v. Williams*, 812 F.3d 787, 792 (10th Cir. 2016). In *Williams*, within sixty days of the gubernatorial election, the plaintiff intended to run a television advertisement supporting an audit of the state's health care exchange by urging voters to call the governor to tell him to support legislation for an audit. *Id.* at 790. In rejecting the plaintiff's argument that unambiguously non-campaign-related speech should be exempted from disclosure requirements, the Tenth Circuit explained: "The logic of *Citizens United* is that advertisements that mention a candidate shortly before an election *are* deemed sufficiently campaign-related to implicate the government's interests in disclosure." *Id.* at 796.

Turning to the mailings at issue here, RGF intends to send mailings mentioning the names of incumbent legislators and provide information about their votes and score on a Freedom Index within 60 days of the election. In accordance with *Independence Institute*, New Mexico has an informational interest in disclosure of the sponsors of such issue speech that mention a candidate shortly before an election. *See id.*; *see also Independence Institute v. Federal Election Commission*, 216 F.Supp.3d 176, 190 (D.D.C. 2016) ("The Institute's advertisement triggers those same informational interests because it links an electoral candidate to a political issue—pending federal legislation addressing unjust sentencing of criminal defendants—and solicits voters to press the legislative candidate for his position on the legislation in the run up to an election.").

Unlike RGF's mailings, IOP's intended mailings do not mention a candidate; rather, they will mention the upcoming referendum to the New Mexico Constitution. The *Sampson* and *Williams* cases are thus more applicable to IOP's mailings than *Independence Institute*. According to *Sampson* and *Williams*, the strength of the government's informational interest in issue speech

related to a referendum increases as the amount of monetary spending on the advertising increases. IOP has set a floor for its spending – "over $9,000" statewide. Besler Decl. ¶ 6, ECF No. 33-1. The record, however, is unclear as to how much higher the spending may climb. The lack of a ceiling on spending makes the sliding-scale analysis difficult to apply to Plaintiffs on this motion for preliminary injunction.

Faced with a similar predicament, the Eleventh Circuit conducted a facial analysis of the state law. *See Worley v. Florida Secretary of State*, 717 F.3d 1238, 1249-50 (11th Cir. 2013). In *Worley*, the plaintiffs brought both a facial and as-applied challenge to Florida's campaign finance disclosure and disclaimer laws. *Id.* at 1242. Although the plaintiffs asserted that they planned to spend at least $600 on radio advertisements, they also wanted to raise and spend more money if able. *Id.* at 1240. The Eleventh Circuit thus noted, "the record before us is not sufficient to establish the nature and scope of Challengers' activity." *Id.* at 1242 n. 2. Accordingly, it analyzed the case as a facial challenge for the following reasons:

> We know little if anything about how much money they intend to raise or how many people they wish to solicit. We will not speculate about their future success as fundraisers. Based on the record we do have, we consider this challenge to the Florida PAC regulations to be a facial challenge. This means that Challengers cannot prevail unless they can prove "that no set of circumstances exists under which the [regulations] would be valid."

*Id.* at 1249-50 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

For similar reasons, Plaintiffs' challenge based on the record thus far seems designed more as a facial challenge set to the statute's minimum thresholds. Without providing the Court with specific facts as to the outer limits of Plaintiffs' independent expenditures, the Court cannot say on this record that the governmental interest is minimal. At the floor, IOP will spend more than twice the amount deemed insufficient for a statewide race in *Williams*. Nevertheless, the Court need not decide at this time if $9,000 is enough under *Sampson/Williams* to establish an important

16

governmental interest because the record says IOP will spend "over $9,000." There is evidence in the record that IOP has a budget over $3 million, so its ambiguous figure of "over $9,000" could well rise sufficiently high to satisfy an amount that the Tenth Circuit would deem sufficiently important. Consequently, the Court finds a sufficiently important governmental interest exists in the disclosure of the funding sources of IOP's mailings sent within 60 days of an election. *Cf. Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 202-03 (1999) ("Disclosure of the names of initiative sponsors, and of the amounts they have spent gathering support for their initiatives, responds to that substantial state interest" in "a control or check on domination of the initiative process by affluent special interest groups".)); *Rio Grande Foundation v. City of Santa Fe*, 437 F.Supp.3d 1051, 1070 (D.N.M. Jan. 29, 2020) ("Applying the sliding scale approach, the Court finds that the $7,700 RGF spent in the small municipal election creates a substantial informational interest in the financial disclosures.") (on appeal).

Disclaimers on mailings revealing the name of the group expending significant amounts on funding the mailing likewise serves a sufficiently important governmental interest in informing the electorate of who is attempting to influence their vote. *Cf. Citizens United*, 588 U.S. at 368 (finding interest in disclaimers that provide electorate with information about person or group who is speaking in political advertisements shortly before election); *Williams*, 815 F.3d at 1278 (acknowledging public's informational interest in issue-committee financial disclosures); *Worley*, 717 F.3d at 1249 ("Our reading of Supreme Court and persuasive Circuit precedent compels us to conclude that promoting an informed electorate in a ballot issue election is a sufficiently important governmental interest to justify the Florida PAC regulations we consider here.").

      **2.   While general concerns exist that Senate Bill 3 will result in loss of privacy and some loss of contributions, Plaintiffs have not established a reasonable likelihood of retaliation**

Plaintiffs point to four burdens they face from the requisite disclosures mandated by Senate Bill 3: (1) increased difficulty in soliciting charitable donations; (2) decreased effectiveness of their message if readers focus on the donors, not the content of their message; (3) loss of privacy; and (4) threats, harassment, or reprisals by public officials and/or activists and opponents in society at large.

Disclosure of contributions "will deter some individuals who otherwise might contribute" and "may even expose contributors to harassment or retaliation." *Buckley*, 424 U.S. at 68. These general concerns, however, do not *de facto* invalidate every disclosure law; rather, a court must carefully consider the evidence of chilled speech and weigh the burdens against the legislative interests. *See id.*

Turning first to the difficulty soliciting donations, Mr. Bessler and Mr. Gessing each averred that he knows of several donors who would not continue their support of their respective organizations if their names were disclosed. *See* Besler Decl. ¶ 12, ECF No. 33-1; Gessler Decl. ¶ 11, ECF No. 33-2. Supreme Court authority, however, indicates that evidence of the loss of only a few donors may not be enough to overcome the government's interest. *Cf. Buckley*, 424 U.S. at 71-72 (finding insufficient appellants' evidence of testimony of several minor-party officials that one or two persons refused to contribute because of the possibility of disclosure).

As to the loss of privacy or the reduced effectiveness of the message, the Supreme Court in *McIntyre* recognized the importance of anonymity, in part, because it allows a person to preserve more of her privacy and it permits an unpopular person or group to communicate without readers prejudging the message. *See McIntyre*, 514 U.S. at 342. In *McIntyre*, the Supreme Court considered an Ohio elections law that prohibited the distribution of anonymous campaign documents designed to influence voters in an election. *See id.* at 336, 344. The law required written documents covered by the statute to contain "the name and residence or business address of the

chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes, or is responsible therefor." *Id.* at 345 (quoting Ohio Rev. Code Ann. § 3599.09(A) (1988)). Because the law regulated the content of speech, the Court applied exacting scrutiny, in which the law is valid "only if it is narrowly tailored to serve an overriding state interest." *Id.* at 347. It noted that *Buckley*'s principles extend equally to issue-based elections like the school tax referendum to which the plaintiff's handbills were addressed. *Id.* The *McIntyre* Court concluded that the state's informational interest in the identity of the speaker was insufficient to require disclosure. *Id.* at 348-49. It later, however, distinguished *Buckley*, explaining that *Buckley*'s mandatory reporting of independent expenditures identifies the amount and use of money in support of a candidate. *Id.* at 355. The *McIntyre* Court contrasted expenditure disclosure laws from disclaimer requirements on a written leaflet, because disclosure of expenditures reveals less information, is less specific, personal, and provocative. *Id.* at 355. Although disclosure of donations says something about the spender's political views, the Supreme Court concluded that "when money supports an unpopular viewpoint it is less likely to precipitate retaliation." *Id.* Consequently, under Supreme Court precedent, with respect to disclosure of expenditures, the loss of privacy and a reduced efficacy of the message alone are not enough to overcome the government's informational interest. Threats, harassment, and retaliation that may occur from mandatory disclosures, however, in some circumstances can outweigh the government's informational interest.

In the seminal case of *NAACP v. Alabama*, the NAACP "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." 357 U.S. 449, 462 (1958). In *Buckley*, the Supreme Court explained that the governmental interests in disclosure as a general matter serve substantial governmental interests. 424 U.S. at 68. To determine if the interests justified the requirements, it

19

examined the extent of the burden the requirements placed on individual rights. *Id.* The appellants argued that the balance tipped against disclosure when required of contributors to minor parties and independents. *See id. at* 68-69. The *Buckley* Court noted that "no appellant in this case has tendered record evidence of the sort proffered in *NAACP v. Alabama*." *Id.* at 71. Although appellants relied on the testimony of several minor-party officials that one or two persons refused to contribute because of the possibility of disclosure, *id.* at 71-72, the Supreme Court determined on the record that "the substantial public interest in disclosure identified by the legislative history of this Act outweighs the harm generally alleged." *Id.* at 72. It explained that "any serious infringement on First Amendment rights brought about by the compelled disclosure of contributors is highly speculative." *Id.* at 69-70.

The *Buckley* Court then addressed the appellants' argument that a blanket exemption should apply for minor parties "lest irreparable injury be done before the required evidence can be gathered." *Id.* at 72. Instead of a blanket exemption, the Court opted for a flexible standard of proof:

> We recognize that unduly strict requirements of proof could impose a heavy burden, but it does not follow that a blanket exemption for minor parties is necessary. Minor parties must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of their claim. *The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties.* The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient. New parties that have no history upon which to draw may be able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views.

*Id.* at 74 (italics added).

Because Plaintiffs' donors have yet to be Fdisclosed to the public,[7] Plaintiffs contend that they cannot offer evidence of retaliation; instead, they rely on evidence of reprisals and threats directed against individuals or organizations holding similar views. Before turning to the evidence of reprisals against other groups, the Court notes that RGF is not a new foundation. RGF has been an established nonprofit speaking out in state and local matters since 2000. *See Rio Grande Foundation*, 437 F.Supp.3d at 1058; https://riograndefoundation.org/about/ (last visited Oct. 8, 2020). Although it has not disclosed most of its donors previously, RGF has a history upon which to draw regarding its organization, staff, board members, speakers, etc. Yet, RGF did not submit specific evidence of reprisals or threats directed against it, its staff, its speakers, or affiliates during the time it has advocated for and against legislation in New Mexico. Arguably, the best evidence of whether there is a reasonable probability RGF's donors would face threats and reprisals is what RGF and persons associated with it have experienced in the last approximately 20 years of RGF's advocacy. As for IOP, it has been operating since 2010, engaging in issue advocacy in Illinois and other states, yet IOP submitted no evidence of harassment or retaliation against the organization itself or its staff.[8]

Plaintiffs nonetheless have concerns about reprisals from public officials who may retaliate for not scoring well on the "Freedom Index," for example, and may deny donor's requests for meetings, discount their lobbying efforts, or other like reprisals. Additionally, they fear reprisals by activists who may take economic retaliation in the form of boycotts. For example, they cite publications from around the country reporting the following: (i) Target and Best Buy were subject

---

[7] RGF notes there is one exception to its donor privacy related to its litigation arising from *Rio Grande Foundation v. City of Santa Fe*, 437 F.Supp.3d 1051, 1070 (D.N.M. Jan. 29, 2020), in which it disclosed donors as required by the City of Santa Fe's ordinance. *See* Gessing Decl. ¶ 8, ECF No. 33-2.

[8] To establish that IOP was founded in 2010, Defendants cite IOP's website, which says it is celebrating its 10-year anniversary. *See* Defs.' Resp. 19 & n.10, ECF No. 35. Because Plaintiffs did not refute this factual assertion, the Court has considered that it has been operating for 10 years.

to boycotts when they gave money to a Chamber of Commerce affiliate that praised a Minnesota candidate who also supported traditional marriage; (ii) retailers and other companies whose owners donated to a Proposition 8 campaign in California were subject to boycotts and some executives lost their jobs for supporting traditional marriage in 2008 and 2014; (iii) in Wisconsin in 2011, unions encouraged members to withdraw funds from a local bank in retaliation of its financial support to Governor Scott Walker in the fight over collective-bargaining reforms; (iv) after gun-control and climate activists targeted corporations that supported the nonprofit American Legislative Exchange Council, over 80 companies ended their financial support of the nonprofit; (v) the graffitiing of a Chick-fil-A by a man upset with its perceived views on homosexuality and Palestine; and (vi) the use of an explosive device found in a mailbox at the home of George Soros, a large contributor to Democratic and progressive causes, among other examples. *See* Pls.' Mot. 15-18, ECF No. 33 (and websites cited therein). This type of evidence from online news sites offers a scattershot picture of reprisals across the country over a time period of more than ten years. Moreover, the evidence is of retaliation against disparate groups and is not enough to establish a reasonable probability that the compelled disclosure of RGF's or IOP's donor's identities will subject them to threats, harassment, or reprisals from officials or private parties. Plaintiffs, for example, have not submitted sufficient evidence to establish that the nonprofit American Legislative Exchange Council is similar enough to RGF or IOP for the Court to draw a conclusion that they are reasonably likely to suffer similar retaliation from their activities.

 *Citizens United* is instructive on this issue of proof. In its as-applied challenge, Citizens United argued that the disclosure requirements could chill donations to it. *Citizens United*, 558 U.S. at 370. Although the Supreme Court noted its concern, it determined that the evidence Citizens United provided did not meet the standard of showing a reasonable probability its members would face threats, harassment, or reprisals where it had disclosed donors for years and

identified no instance of such retaliation. *Id.* It therefore concluded that the informational interest in knowing who is speaking about a candidate shortly before an election outweighed the group's unsupported, general concern about chilled speech. *See id.* at 369-70. Examining the record here, the concerns about chilled speech are likewise general and unsupported. There is not enough evidence to establish a reasonable probability that identified RGF and/or IOP donors have been or would be subject to threats, harassment, and reprisals.[9]

### 3. Senate Bill 3's disclaimer requirement imposes a burden on Plaintiffs by compelling speech and infringing on their right to privacy and anonymity

In Count II, Plaintiffs assert that the law's mandate to state the sponsors of the mailings on the face of their advertisements is also unconstitutional. Disclosure and disclaimer burdens differ in some ways. The Tenth Circuit interpreted the Supreme Court's decision in *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), (hereinafter "*ACLF*") as distinguishing "between the mandatory disclosure in public of a speaker's identity and the requirement that a speaker provide information to the government that could later be used to trace speech back to its source." *Doe v. Shurtleff*, 628 F.3d 1217, 1222-23 (10th Cir. 2010). According to the Tenth Circuit, in *ACLF* the Supreme Court distinguished between a provision that required petition circulators to wear name badges and a provision that required circulators to file with the state affidavits including their names and addresses: while the former provision unconstitutionally burdened speech because it compelled identification "at the precise moment when the circulator's interest in anonymity is

---

[9] In *Citizens United*, like here, the plaintiff presented evidence of retaliation against supporters of Proposition 8 in California. *See Citizens United*, 558 U.S. at 480-82 (Thomas, J., concurring in part and dissenting in part). Justice Thomas dissented from upholding the federal disclosure, disclaimer, and reporting provisions, explaining how the internet enables activists to access information needed to intimidate and retaliate against opponents long before a plaintiff could prevail on an as-applied challenge. *See id.* at 484. Justice Thomas' view, however, was rejected by the majority. This Court is bound by the majority opinion and the evidentiary burden a plaintiff must satisfy to establish that disclosure will expose its members to retaliation to avoid application of the disclosure law. While the Supreme Court offers a more flexible approach to proof, so a plaintiff does not have to wait for threats or retaliation to start before challenging a law that is chilling its members' speech, the Supreme Court nonetheless requires more specific evidence that a plaintiff may face similar threats or reprisals than Plaintiffs presented here. *See id.* at 370.

greatest," the affidavit requirement affected anonymity only after the conversations were complete, "exemplif[ying] the type of regulation for which *McIntyre* left room." *Id.* (quoting *ACLF*, 525 U.S. at 199, 200).

Relying on *McIntyre*, Plaintiffs assert that the disclaimer requirement burdens their right to privacy by identifying them as the speaker, undermining the effectiveness of their message and subjecting them to the probability of official and unofficial retaliation. As for potential retaliation, for the same reasons given above, Plaintiffs have not demonstrated enough evidence to establish a reasonable probability that RGF or IOP would be subject to threats, harassment, and reprisals. Nonetheless, the Supreme Court recognized that requiring the inclusion of a speaker's identity is no different from requiring other content in a document that the speaker is free to include or exclude, *McIntyre*, 514 U.S. at 348, and such compelled speech is more burdensome than disclosure requirements:

> Though such mandatory reporting undeniably impedes protected First Amendment activity, the intrusion is a far cry from compelled self-identification on all election-related writings. A written election-related document—particularly a leaflet—is often a personally crafted statement of a political viewpoint. Mrs. McIntyre's handbills surely fit that description. As such, identification of the author against her will is particularly intrusive; it reveals unmistakably the content of her thoughts on a controversial issue. Disclosure of an expenditure and its use, without more, reveals far less information.

*Id.* at 355. In accordance with *McIntyre* and *ACLF*, compelled disclaimers impose a burden on Plaintiffs' right to privacy and anonymity that this Court must consider.

   **4.  On this record, balancing of informational interest against burdens of disclosure and disclaimer requirements weighs in favor of applying Senate Bill 3 to Plaintiffs' mailings**

   **a.  New Mexico's disclosure requirements likely will survive exacting scrutiny as applied to RGF and IOP**

New Mexico's disclosure requirements are limited to advertisements that refer to a clearly identified candidate or ballot question and are published and disseminated to the relevant electorate

in New Mexico within 30 days before a primary election or 60 days before a general election. New Mexico's law is thus temporally cabined. Had RGF and IOP chosen to send their mailings more than 60 days before the election, they would not be subject to the disclosure requirements. The law is also only triggered when certain threshold amounts are met for independent expenditures -- $9,000 for statewide elections and $3,000 for non-statewide elections. The holding of *Independence Institute* thus appears to apply here. *Cf. Independence Institute*, 812 F.3d at 797-98 (upholding Colorado disclosure regime as applied to nonprofit for communications that unambiguously referred to gubernatorial candidate within 60 days of election where spending requirements covered those who annually spend $1000 or more to disclose donors of $250 or more and that were "sufficiently tailored to the public's informational interests").

Plaintiffs, however, contend that the law is not carefully tailored because, unlike in *Independence Institute* where disclosures only covered "those donors who have specifically earmarked their contributions for electioneering purposes," 812 F.3d at 797, the requisite disclosures in New Mexico extend to donors who give to the general fund. According to Plaintiffs, Senate Bill 3 too broadly covers donors who give more than $5,000 to the general fund, which may be used for operations or issues that have nothing to do with the controversial issue advocacy, and therefore, the informational interest is too de minimus to outweigh the burdens of disclosure.

Defendant asserts that the requirement of disclosing large donations to the general fund is necessary to avoid a loophole that would allow groups to avoid disclosure altogether by using only general funds for all issue advocacy within 60 days of the general election, subverting the purpose of the law to disclose special interests to voters. Unlike the much lower $200 threshold for disclosure of donors who earmark their donations for the expenditure, § 1-19-27.3(D)(2) requires a higher $5,000 threshold for donors to the general fund. Moreover, contributors of $5,000 or more to a general fund may also opt-out of disclosure by specifying in writing that the contribution was

25

not to be used "to fund independent or coordinated expenditures or to make contributions to a candidate, campaign committee or political committee." N.M. Stat. Ann. § 1-19-27.3(D)(2).

Section 1-19-27.3 only requires disclosures of large donors who contribute to the general fund when the organization uses general funds to pay for independent expenditures referring to candidates or ballot initiatives shortly before a New Mexico election. By providing a way for general fund donors to opt-out of disclosure under New Mexico law by specifying that their donations were not for independent expenditures, the law focuses on donors whose general fund contributions may have been used for independent expenditures in New Mexico. Consequently, even though the law requires disclosures of some contributions to the general fund, with its opt-out provision and limitation for when general funds pay for independent expenditures in New Mexico, the provision is carefully tailored to the informational interest. *Cf. Delaware Strong Families*, 793 F.3d at 312 (rejecting argument that earmarking limitation was required for Delaware's campaign disclosure law to survive exacting scrutiny).

New Mexico has an important informational interest in the disclosure of donors of more than $200 who earmark their contributions for mailings within 60 days of the election related to a candidate and of donors of more than $5,000 to the general fund who do not opt-out of their disclosure, when the expenditures are made from non-earmarked funds. *Independence Institute* is on point as to RGF's mailings regarding candidates. As for IOP's mailings to influence the referendum, the known expenditures at issue here exceed those of *Sampson/Williams* and the potential expenditures may rise to a level invoking a substantial governmental interest. The Supreme Court has indicated there is a governmental interest in knowing where ballot initiative advocacy money comes from and how it is spent, so citizens have more information about whether special interests are attempting to influence the election. *See*, *e.g.*, *ACLF*, 525 U.S. at 202-03. Voters will have more information to decide what weight to give the advertisements.

As for the burdens, on the current record, neither RGF nor IOP has not shown a reasonable probability that its donors will suffer reprisals. Even considering newspaper accounts as evidence, the record of threats, harassment, or reprisals is highly speculative. Mr. Gessing's and Mr. Besler's affidavits did not provide specific examples of retaliation to support their general fears of reprisals and harassment. Nor did they give detailed evidence about the amount of expected lost contributions or how such lost contributions could affect their ability to communicate their messages. Although the Court has concerns about the potential chilling effect of disclosure laws, in accordance with *Buckley* and *Citizens United*, a general concern about chilled speech does not outweigh the important informational interest in this case. While the disclosures may "undoubtedly chill potential donors to some extent, these requirements are sufficiently drawn to serve the public's informational interests and are less restrictive than other alternatives." *Independence Institute*, 812 F.3d at 798. In light of the absence of concrete, specific evidence of a reasonable probability that the compelled disclosure will subject Plaintiffs to threats, harassment, or reprisals, the Court is not convinced that Plaintiffs will prevail at trial on the merits of their as-applied challenged to the state's disclosure requirements.

Based on the current record, the law is tailored so that there is a substantial relationship between the informational interest and the information sought to be disclosed. Accordingly, RGF and IOP have not met their burden to show a substantial likelihood of success on the merits of Count I.

### b. New Mexico's disclaimer requirements likely will survive exacting scrutiny as applied to RGF and IOP

Plaintiffs rely on *Citizens for Responsible Government State Political Action Committee v. Davidson*, 236 F.3d 1174 (10th Cir. 2000), in arguing that, as-applied, New Mexico's disclaimer provision is unconstitutional. In *Davidson*, the plaintiffs challenged a provision in Colorado's Fair

Campaign Practices Act requiring persons who make independent expenditures over $1,000 to include identifying information in any political message produced using the expenditure, including the person's name, the name of the registered agent, the amount of the expenditure, and a prominent statement that "the advertisement or material is not authorized by any candidate." *Id.* at 1198-99 & n.10. According to the *Davidson* plaintiffs, the disclaimer violated their right to engage in anonymous political speech. *Id.* at 1199. Relying on *McIntyre*, the Tenth Circuit explained that the "Supreme Court has recognized that disclaimer statutes, which require that a speaker include specified language or information in her speech, impose more substantial burdens on First Amendment rights than disclosure or reporting provisions…." *Id.* at 1199. It further noted that the Supreme Court in *ACLF* expressed "its distaste" for disclaimer statutes. *Id.* Analyzing the disclaimer provision using "strict scrutiny, the Tenth Circuit determined that Colorado offered essentially no reasons in support of the disclaimer requirements, the statute was not narrowly tailored, and consequently, it did not survive strict scrutiny. *See id.* at 1199-1200.

Defendant urges the Court to apply *Citizens United*, not *McIntyre* or *Davidson*. Defendant asserts that *McIntyre* is limited to the facts of a lone individual handing out pamphlets who wishes to remain anonymous and that *Davidson* should not be followed because it applied strict, rather than exacting, scrutiny. Instead, Defendant contends that *Citizens United* should control the pre-election communication here, also citing *Worley v. Florida Secretary of State*, 717 F.3d 1238 (11th Cir. 2013), in support.

Approximately ten years after the *Davidson* decision, the Supreme Court decided *Citizens United*, upholding the federal disclaimer provision as applied to a commercial advertisement broadcast shortly before the election that referred to a political candidate by name with pejorative

references to her candidacy. *See Citizens United*, 558 U.S. at 368.[10] The Supreme Court, relying on *Buckley* and *Bellotti*, confirmed that there is an informational interest in disclaimers in electioneering communications to fully inform voters about the person or group who is speaking shortly before an election. *See id.* at 368-69. Notably, the majority did not analyze *McIntyre* when discussing the disclaimer provision. *See id.* at 368-69. Consequently, the Tenth Circuit's understanding that the Supreme Court has a "distaste" for disclaimer provisions is no longer entirely accurate after *Citizens United*.

Additional reasons persuade the Court that *Davidson* does not control resolution of this case. As this Court discussed previously, the government has an important interest in informing the electorate of who is funding advertisements published shortly before an election and that refer to a specific candidate or referendum on the ballot. In *Davidson*, however, the State of Colorado failed to establish a governmental interest in support of its disclaimer requirement, so the Tenth Circuit had little beneficial interest to weigh against the burdens of the disclaimer law. *See Davidson*, 236 F.3d at 1199. Also, in *Davidson*, Colorado required considerably more information for disclaimers: the name of the person, the name of the registered agent, the amount of the expenditure, and a prominent statement that "the advertisement or material is not authorized by any candidate." *Id.* at 1198-99. New Mexico's disclaimer provision by contrast only requires the name of the candidate, committee, or other person who authorized and paid for the advertisement. N.M. Stat. Ann. § 1-19-26.4(A). New Mexico's provision therefore requires less compelled speech. For these reasons, even if the *Davidson* court applied exacting scrutiny, there are other reasons that its holding would not govern here.

---

[10] Under Section 311 of the Bipartisan Campaign Reform Act of 2002 disclaimer provision, televised electioneering communications funded by persons other than a candidate had to include the name and address (or website address) of the person or group that funded the advertisement and statements that the communication "is not authorized by any candidate or candidate's committee" and that "____ is responsible for the content of this advertising." *Citizens United*, 558 U.S. at 366.

Turning then to one of the out-of-circuit cases relied upon by Defendant, *Worley*, the challengers opposed Florida's disclaimer requirement that compelled speakers who spend money on an election to identify themselves in their political ads. *Worley*, 717 F.3d at 1241. The Eleventh Circuit rejected the argument that there is no informational interest in the context of ballot initiatives, relying on *Citizens United* and *Bellotti*. *See id.* at 1246-47. In contrast to the Tenth Circuit in *Sampson*, the Eleventh Circuit rejected the notion that knowing the messenger may distort the message, *id.* at 1248; and instead, it concluded that the other circuits that recognized "a sufficient informational interest in the ballot issue context have the better arguments," *id.* at 1249. The *Worley* court determined that, despite the context of a ballot election, *Citizens United* controlled because the federal disclaimer requirement was materially indistinguishable, and precedent did not support a meaningful distinction between candidate elections and ballot initiatives. *See id.* at 1254. As for *McIntyre*, the Eleventh Circuit called it a "narrow decision" limited to a person distributing leaflets and not applicable to groups that spend money in elections for ads. *See id.* at 1254.[11]

While *Worley* supports Defendant's position, this Court is nonetheless bound by Tenth Circuit precedent. For a few reasons, a court in this circuit cannot merely overlay the Eleventh Circuit's analysis in *Worley*. At least as pertains to speech related to referendums, the Tenth Circuit applies a sliding-scale approach based on the amount a group is spending on its issue advocacy to determine the strength of the governmental interest, an approach the Eleventh Circuit rejected. Unlike the Eleventh Circuit, the Tenth Circuit finds the difference between ballot initiatives and

---

[11] The Seventh and Ninth Circuits have likewise distinguished *McIntyre*. *See Yamada*, 786 F.3d at 1203 n.14 ("An individual pamphleteer may have an interest in maintaining anonymity, but [l]eaving aside *McIntyre*-type communications ... there is a compelling state interest in informing voters who or what entity is trying to persuade them to vote in a certain way.") (omitting internal quotation); *Majors*, 361 F.3d at 355 ("Several cases, signally *McIntyre* itself, expressly or implicitly contrast the fragility of the small independent participant in political campaigns with large corporations or other organizations.").

candidate elections meaningful – who is helping to finance a candidate's election may reveal a candidate's beliefs and what influences may be brought to bear on him or her in contrast to a ballot election where the evaluation is only of discrete governmental action. *Sampson*, 625 F.3d at 1256-57. Although *Citizens United* did not discuss *McIntyre* in its reasoning on the constitutional validity of disclaimer provisions, the Tenth Circuit has continued to rely on *McIntyre*'s expressions of the importance of anonymity in allowing the message to be considered on its own merit. *See id.* at 1257 (quoting *McIntyre*, 514 U.S. at 342). According to the Tenth Circuit, the Supreme Court has sent a "mixed message" regarding the value of disclosures in ballot-issue campaigns, with *McIntyre* on the one hand and dicta in cases like *Bellotti* and *ACLF* on the other. *See id.* at 1257-58. Subsequently, relying on *ACLF*, the Tenth Circuit indicated that after-the-fact disclosures of funding sources may be more carefully tailored to the informational interest than disclaimers that identify the speaker's name at the time the speaker wishes to be heard. *See Shurtleff*, 628 F.3d at 1223-25.

Although *ACLF* indicates that disclosure provisions may be more carefully tailored to the informational interest than disclaimer provisions, this Court is not convinced *ACLF* stands for the proposition that disclaimer laws related to issue advocacy may never be sufficiently tailored to informational interests. In *ACLF*, the Supreme Court concluded Colorado's name badge requirement for petition circulators was unconstitutional. *See ACLF*, 525 U.S. at 197-200. Evidence in *ACLF* revealed that requiring circulators to wear identification badges interfered with participation in the petitioning process because of the potential for in-person harassment while the circulators attempted to persuade members of the public to sign petitions. *See id.* at 197-98. Although the State argued that the badge helped identify those who engaged in misconduct, the Supreme Court concluded that the provision requiring the filing of an affidavit with the circulator's name responded to that concern. *See id.* at 198. The affidavit requirement reduced the risk of in-

the-heat-of-the-moment harassment yet allowed law enforcement access to the information for compliance purposes. *See id.* at 198-99. The Supreme Court compared its decision to *McIntyre*, explaining that circulating a petition is like distributing a handbill because they involve "one-on-one communication" and the affidavit requirement, which is completed after the in-person conversations, exemplifies the type of requirement "for which *McIntyre* left room." *Id.* at 199-200.

Unlike in *McIntyre* and *ACLF*, Plaintiffs are mailing their communications. This case thus does not involve the in-person potential for harassment at the time of the communication that was at issue in *McIntyre* and *ACLF*. Plaintiffs in this case also have not made the particularized showing necessary to establish that harassment against the organizations or their financial supporters is reasonably likely to occur as a result of the disclaimer. The lack of in-person communication and proven security concerns distinguish this case from *ACLF* and *McIntyre*.

None of the above cited authority on disclaimer provisions neatly covers the provision here. Although this case is not on all fours with *Citizens United*, the Court finds its holding most akin to the situation at hand. The informational interest here is important in knowing the name of organizations intending to spend significant sums attempting to sway citizens' vote on candidate and referendum elections using mailings. As in *Citizens United*, the public has an interest in knowing that RGF is sponsoring the mailings about candidates shortly before the election and the disclaimer provision is carefully tailored to the name of the organization sending the mailings and to mailings within 60 days of a general election. Although IOP's mailings pertain to a referendum, the voters have an informational interest in knowing who the source of the mailings is when the source is spending a significant amount for the mailed advertisements. Again, the disclaimer is carefully tailored to the name of the sponsor and only affect mailings sent within 60 days of the general election. Although disclosure requirements are also in place, the Supreme Court in *Citizens United* did not strike the federal disclaimer provision because the federal act also contained

32

disclosure provisions. Accordingly, Plaintiffs have not satisfied their burden of establishing they are sufficiently likely to succeed on the merits of Count II by showing that the disclaimer provision, as applied to them, violates their First Amendment rights.

### B.  Preliminary injunction remaining elements

Because Plaintiffs have not succeeded on the first element necessary to prevail on a motion for preliminary injunction, the Court need not consider the remaining requirements.

**IT IS THEREFORE ORDERED** that Plaintiffs' *Motion for Preliminary Injunction and Memorandum of Law in Support Thereof* (**ECF No. 33**) is **DENIED**.

_____
SENIOR UNITED STATES DISTRICT JUDGE