**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

RIO GRANDE FOUNDATION,

     Plaintiff,

v.                                    No. Civ. 1:19-cv-01174-JCH-JFR

MAGGIE TOULOUSE OLIVER, in her
official capacity as Secretary of State
of New Mexico,

     Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court are cross motions for summary judgment: *Plaintiff's Combined Motion for Summary Judgment and Memorandum of Law* (ECF No. 76), filed by Plaintiff Rio Grande Foundation ("Plaintiff" or "RGF"), and the *Secretary of State's Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment* (ECF No. 79), filed by Defendant Maggie Toulouse Oliver, in her capacity as Secretary of State of New Mexico ("Defendant" or "the Secretary"). Plaintiff seeks summary judgment on Count I of the Amended Complaint, the only remaining count in the case, to enjoin the Secretary from enforcing certain disclosure provisions of 2019 New Mexico Senate Bill 3 ("SB 3"). More specifically, RGF asserts that Section 1-19-26(N)(3)(c) violates the First Amendment by unconstitutionally infringing on speech that amounts to issue advocacy, not electioneering speech. Defendant, in urging the Court to deny RGF's motion, argues that New Mexico's disclosure laws are substantially related and narrowly tailored to the public interest in knowing who is making large election-related advertisements about a candidate or ballot measure shortly before an election. For the same reasons, Defendant seeks summary judgment in her favor on Count I. In considering the Secretary's motion first, and viewing the facts in favor of RGF, the Court

concludes that Section 1-19-26(N)(3)(c) satisfies exacting scrutiny and does not violate the First Amendment. Accordingly, Defendant's cross-motion for summary judgment will be granted. Turning then to RGF's motion for summary judgment, and viewing the facts in favor of the Secretary, the Court will deny RGF's motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  SB 3

Effective July 1, 2019, SB 3 became law, which amended the New Mexico Campaign Reporting Act ("CRA") to include disclaimer and disclosure requirements for certain electioneering communications. Campaign Reporting Act, ch. 262, 2019 N.M. Laws § 1 (codified as amended at N.M. Stat. Ann. §§ 1-19-26.4, 27.3; *id.* at § 2-21-1).[1] A person who knowingly or willfully violates the CRA shall be punished by a fine of not more than $1,000 or by imprisonment for not more than a year or both. N.M. Stat. Ann. § 1-19-36(A). The state ethics commission may also institute an action for relief for violations of the CRA, including a civil penalty of up to $1,000 for each violation, not to exceed a total of $20,000. *Id.* § 1-19-34.6(B).

The CRA, as amended, requires political committees to register with the Secretary and to disclose (1) the name of the committee, including any sponsoring organization, and its address; (2) a statement of the committee's purpose; (3) the names and addresses of the officers of the committee; and (4) an identification of any bank account used for contributions or expenditures. N.M. Stat. § 1-19-26.1(B) and (C). The parties here do not dispute that RGF is a political committee within the meaning of the CRA.

---

[1] RGF and former Plaintiff Illinois Opportunity Project ("IOP") challenged the disclaimers in advertisements provision of SB 3 in Count II. This Court granted summary judgment to Defendant on Count II, concluding that both Plaintiffs lacked standing to challenge the disclaimer provision. (Mem. Op. and Order 13-14, 18-19, ECF No. 60.) The Tenth Circuit affirmed that portion of the decision, so the disclaimer provisions are no longer at issue. *See Rio Grande Foundation v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023). The Court will thus only set forth the relevant provisions of SB 3 that pertain to the disclosure requirements.

SB 3 also amended the CRA to require that any person making an independent expenditure or an aggregated independent expenditure during an election cycle that exceeds $1,000 in a nonstatewide election or $3,000 in a statewide election to file a report with the Secretary. *Id.* § 1-19-27.3(A)(1). The report must include: (1) the name and address of the person making the independent expenditure; (2) the name and address of the person to whom the independent expenditure was made and the amount, date, and purpose of the independent expenditure; and (3) the source of the contributions used to fund the independent expenditure, as set forth in Subsections C and D. *Id.* § 1-19-27.3(B).

According to Subsection C, for independent expenditures of $3,000 or less in a nonstatewide election or $9,000 or less in a statewide election, the person making the independent expenditure must disclose in the report to the Secretary "the name and address of each person who has made contributions of more than a total of two hundred dollars ($200) in the election cycle that were earmarked or made in response to a solicitation to fund independent expenditures" and the amount of each such contribution. *Id.* § 1-19-27.3(C). For independent expenditures of more than $3,000 in a nonstatewide election or more than $9,000 in a statewide election, Subsection D provides that the person making such independent expenditures must either:

> (1) if the expenditures were made exclusively from a segregated bank account consisting only of funds contributed to the account by individuals to be used for making independent expenditures, report the name and address of, and amount of each contribution made by, each contributor who contributed more than two hundred dollars ($200) to that account in the election cycle; or
>
> (2) if the expenditures were made in whole or part from funds other than those described in Paragraph (1) of this subsection, report the name and address of, and amount of each contribution made by, each contributor who contributed more than a total of five thousand dollars ($5,000) during the election cycle to the person making the

3

expenditures; provided, however, that a contribution is exempt from
reporting pursuant to this paragraph if the contributor requested in
writing that the contribution not be used to fund independent or
coordinated expenditures or to make contributions to a candidate,
campaign committee or political committee.

N.M. Stat. Ann. § 1-19-27.3(D).

Under the CRA, an "independent expenditure" is "an expenditure" that is:

(1) made by a person other than a candidate or campaign committee;

(2) not a coordinated expenditure as defined in the Campaign Reporting Act;
and

(3) made to pay for an advertisement that:

(a) expressly advocates the election or defeat of a clearly identified
candidate or the passage or defeat of a clearly identified ballot
question;

(b) is susceptible to no other reasonable interpretation than as an
appeal to vote for or against a clearly identified candidate or ballot
question; or

(c) refers to a clearly identified candidate or ballot question and is
published and disseminated to the relevant electorate in New
Mexico within thirty days before the primary election or sixty days
before the general election at which the candidate or ballot
question is on the ballot.

N.M. Stat. Ann. § 1-19-26(N). The CRA defines an "expenditure" as "a payment, transfer or

distribution or obligation or promise to pay, transfer or distribute any money or other thing of

value for a political purpose." N.M. Stat. Ann. § 1-19-26(M). A "political purpose" under the

CRA "means for the purpose of supporting or opposing a ballot question or the nomination or

election of a candidate." *Id.* § 1-19-26(S).

According to the CRA, the Secretary must make the disclosures electronically searchable

by the public via the internet. *See* N.M. Stat. Ann. § 1-19-32(C). Independent expenditure reports

are posted on the Secretary of State's website and are publicly searchable. (Pl.'s UF ¶ 12, ECF No. 76.)

**B.     RGF and the Freedom Index**

**1.     Undisputed Facts**

Rio Grande Foundation is an established 501(c)(3) charitable organization and research institute based in New Mexico. (Pl.'s Combined Mot. for Summ. J. ("Pl.'s MSJ"), Undisputed Fact (hereinafter "Pl.'s UF") ¶ 1, ECF No. 76.) Dedicated to increasing liberty and prosperity for all New Mexico's citizens, RGF informs New Mexicans of the importance of individual freedom, limited government, and economic opportunity. (*Id.*) RGF engages in issue advocacy on topics central to its mission. (*Id.*) It has been speaking out in state and local matters since 2000. (Def.'s UF ¶ H, ECF No. 79.)

RGF publishes an online "Freedom Index" that tracks legislators' floor votes on bills that are important to RGF. (Pl.'s UF ¶ 1, ECF No. 76; Def.'s Resp. 12, ECF No. 79 at 14 of 39 (admitting RGF publishes its Freedom Index on its website); Gessing Decl. ¶ 5, ECF No. 33-2; Gessing Dep. 38:10-21, ECF No. 56-1.) RGF's publication of the Freedom Index has to date been online. (Gessing Dep. 38:10-21). RGF did not mail any postcards with Freedom Index results. (Gessing Dep. 53:20-54:8, ECF No. 56-1.) Instead, RGF mailed a taxpayer pledge card and did some social media advertising at a lower expense. (*Id.*)

RGF receives financial support for its general fund from a variety of sources, including multiple donors over $5,000. (Pl.'s UF ¶ 15, ECF No. 76.) Some donors give over $5,000 in a single-election contribution, while others give over $5,000 total in a two-year cycle. (*Id.*)

RGF subjectively fears that if its donors are disclosed, they may be subject to retaliation and harassment by intolerant members of society. (*See* Pl.s' UF ¶ 17, ECF No. 76; Def.'s Resp. ¶

17, ECF No. 79 (admitting for purposes of this motion that RGF alleges a fear of harassment of its donors if their identities are disclosed).) RGF also subjectively fears that if its donors are disclosed, some donors may stop contributing to RGF out of fear of retaliation and harassment by intolerant members of society. (*See* Pl.s' UF ¶ 18, ECF No. 76; Def.'s Resp. ¶ 18, ECF No. 79 (admitting for purposes of this motion that RGF alleges a fear of lost donations if its donors' identities are disclosed).) RGF admits that it is not aware of any harassment or retaliation of its employees or donors. (Defs.' UF ¶ J, ECF No. 79.)

### 2.    Disputed facts

The parties dispute the extent to which RGF made or would make independent expenditures to circulate the Freedom Index via mail. According to RGF's president, RGF planned to mail its Freedom Index to thousands of New Mexico voters within 60 days of the November 2020 general election. (*See* Gessing Decl. ¶¶ 2, 5, ECF No. 33-2.) The mailed communication would have named the incumbent legislator and provided information on the legislator's votes and score on the Freedom Index. (*Id.*) RGF's president stated that RGF intended to spend over $3,000 in individual legislative districts on the mail campaign, and that it intends to engage in substantially similar issue speech in future New Mexico elections. (*Id.* ¶ 6.) But he testified that, because of SB 3's disclosure requirements, RGF will withhold spending above the $3,000 threshold per legislative district for the foreseeable future. (Gessing Dep. 74:5-20, ECF No. 56-1.)

The Secretary disputes the facts in the foregoing paragraph, relying on evidence from RGF's president that, prior to 2020, RGF did not make independent expenditures in amounts great enough to trigger SB 3's reporting obligations. (*See* Gessing Dep. 34:3-35:7, ECF No. 56-1.) The Secretary contends that RGF's failure to engage in expenditures prior to 2020 in amounts

sufficient to trigger the disclosure requirements of SB 3 suggests the opposite inference can be made – that RGF does not have future plans to engage in substantially similar issue speech in future New Mexico elections. As additional support, the Secretary cites the following testimony from RGF's president: when asked about specific contemplated mailings that would cost more than $3,000 in any legislative district, he admitted that "the only thing that we have kind of even contemplated," was on a mailing for a special federal election that is "outside of the scope of this direct lawsuit." (*Id.* at 75:2-77:2.)

Additionally, the parties dispute the objective reasonableness of RGF's fear of donor harassment and retaliation and fear of loss of donors' financial contributions resulting from disclosure of their identities. According to RGF's president, he is personally aware of instances where donors to organizations with similar views were subject to retaliation and harassment, including boycotts, online harassment, and social ostracism. (Gessing Decl. ¶ 10, ECF No. 33-2.) Based on Mr. Gessing's fundraising experience, he and RGF believe that RGF's members, supporters, and potential donors will be less likely to contribute to its mission if their identities are disclosed. (Gessing Decl. ¶ 11, ECF No. 33-2.) RGF's president knows of several donors who support RGF that would not continue to do so if they were subject to disclosure. (*Id.*)

The Secretary, however, denies that there is a record of any significant retaliation or harassment of RGF that would substantiate the fears. Even though RGF's president said in his declaration that he was aware "of at least one past instance where individuals … in New Mexico were threatened with or experienced retaliation," at his deposition, he could not recall any details regarding this instance. (*Id.*) RGF's president testified in his April 2021 deposition that "New Mexico is a little bit unique," and because of the constitutional amendment process, "we don't have as many of those volatile issues" that attract harassment. (*See* Def.'s UF ¶ K, ECF No. 79.)

In April 2021, RGF had not made and did not have any plans to make expenditures on the hot-button issues – labor, the Second Amendment, the environment, or energy—that it flagged as raising a risk of retaliation. (*Id.*) RGF's president testified that, although donors have told RGF that they fear the disclosure of their identity, donors have not stated that they would not donate if their information were made public. (Defs.' UF ¶ L, ECF No. 79.)

### C. Procedural History

Plaintiff RGF and former Plaintiff IOP filed suit against the Secretary in December 2019. In their amended complaint filed in February 2020, they asserted that, by requiring them to disclose their financial supporters and identify themselves in the mailings they intended to make shortly before the November 3, 2020, general election, Defendant violated their First and Fourteenth Amendment rights. (*See* Am. Compl. ¶¶ 26-27, 37-44, ECF No. 13.) Plaintiffs requested injunctive and declaratory relief that would enjoin the enforcement of the disclosure provisions in SB 3 (Count I) and of the registration and disclaimer provisions in SB 3 (Count II). (*See id.* ¶¶ 37-44.)[2]

Plaintiffs then moved the Court for a preliminary injunction, based on how SB 3 "applied to Plaintiffs and other issue advocacy organizations." (Pls.' Mot. for Preliminary Injunction 6, ECF No. 33 at 11 of 31.) This Court denied the motion, concluding that Plaintiffs had not shown a substantial likelihood of success on the merits. (Mem. Op. and Order 1, 27, ECF No. 38.)

After the 2020 election passed, the parties filed cross-motions for summary judgment. This time, Plaintiffs made a facial challenge to SB 3. (*See* Pl.'s Am. Mot. for Summ. J. 6, ECF No. 53 at 8 of 30.) In response and in cross-motion, the Secretary argued Plaintiffs lacked standing to bring a facial challenge to SB 3 because they were not injured by the challenged

---

[2] Plaintiffs previously voluntarily dismissed Count III of the Amended Complaint, an ultra vires challenge to the Secretary's rulemaking under the CRA. (*See* Stipulation to Voluntarily Dismiss Count III, ECF No. 22.)

laws, and alternatively, that the laws were constitutional because they were narrowly tailored to serve important informational interests. (*See* Def.'s Resp. and Cross-Mot. for Summ. J. 1-2, ECF No. 56 at 3-4 of 39.) This Court granted the Secretary's motion for summary judgment based on lack of Article III standing, and thus, did not address the merits of Plaintiffs' claims. (*See* Mem. Op. and Order 2, 18, ECF No. 60.) On appeal, the Tenth Circuit reversed this Court's dismissal of RGF's challenge to the disclosure requirement (Count I), but it affirmed this Court's decisions to dismiss IOP for lack of standing and to dismiss RGF's challenge to the disclaimer provisions (Count II) for lack of standing. *See Rio Grande Foundation v. Oliver*, 57 F.4th 1147, 1167 (10th Cir. 2023).

After remand, RGF and the Secretary filed cross-motions for summary judgment on the merits of RGF's only remaining claim, Count I. The Court will first address the Secretary's motion before turning to RGF's motion.[3]

## II.    SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and

---

[3] The Secretary argued in her cross-motion that RGF lacks standing to challenge the CRA's disclosure requirements for independent expenditures for advertisements referring to ballot measures, because its proposed ads do not discuss ballot measures. (Def.'s Cross Mot. 24, ECF No. 79 at 26 of 39.) The Secretary, however, does not contend the Court should enter summary judgment based on standing, but notes that the Secretary may contest RGF's standing at trial. (*See* Def.'s Cross-Mot. 9, ECF No. 79 at 9 of 11; Def.'s Reply 14, ECF No. 83 at 16 of 18.) Indeed, the Tenth Circuit previously ruled on the summary judgment record that RGF has standing to mount a facial challenge to SB3 based on RGF's past engagement of issue advocacy in New Mexico, its intent to engage in substantially similar issue speech in future elections in New Mexico, and its tailoring of its speech to avoid triggering SB3's donor disclosure requirements. *See Rio Grande Foundation v. Oliver*, 57 F.4th 1147, 1158-59, 1163-65 (10th Cir. 2023). Given the Tenth Circuit's failure to limit the type of facial challenge RGF can make, the Court will consider each of RGF's arguments in support of its facial challenge to SB3 that are in its summary judgment briefs.

admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995).

Cross-motions for summary judgment must be treated separately, and the denial of one does not require the grant of the other. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir.1979)). When considering cross-motions for summary judgment, a court may assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is inappropriate if material factual disputes nevertheless exist. *Id.* When, as here, the government restricts speech, "the Government bears the burden of proving the constitutionality of its actions." *McCutcheon v. Federal Election Com'n*, 572 U.S. 185, 210 (2014) (quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000)).

## III.   ANALYSIS

The First Amendment prohibits the government from abridging the freedom of speech and assembly and protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Effective advocacy is enhanced by group association. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). "[P]rivacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* at 462. Consequently, as long recognized by the Supreme Court, "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental

action." *Americans for Prosperity Foundation v. Bonta*, 594 U.S. __, 141 S.Ct. 2373, 2382 (2021) (quoting *NAACP*, 357 U.S. at 462). *See also Buckley v. Valeo*, 424 U.S. 1, 64 (1976) ("compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment"). The CRA's disclosure requirements implicate these First Amendment speech and associational rights for RGF and its financial supporters.

## A. Defendant's Cross-Motion for Summary Judgment

RGF in Count I of the Amended Complaint seeks the issuance of an injunction enjoining Defendant from enforcing the disclosure requirement for persons making independent expenditures as defined by N.M. Stat. Ann. § 1-19-26(N)(3)(c). The parties agree that RGF brings a facial challenge to § 1-19-26(N)(3)(c).

### 1. Standard for facial challenges

Generally, on a facial challenge to a law, the plaintiff must "establish that no set of circumstances exists under which the [law] would be valid," or must show that the law lacks "a plainly legitimate sweep." *Bonta*, 141 S.Ct. at 2387 (quoting, respectively, *United States v. Salerno*, 481 U.S. 739, 745, (1987), and *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)). The Supreme Court recognizes another type of facial challenge in First Amendment cases: "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange*, 552 U.S. at 449, n.6). "To succeed in an overbreadth challenge, thereby invalidating *all* enforcement of the law, a challenger must show that the potential chilling effect on protected expression is both real and substantial." *United States v. Brune*, 767 F.3d 1009, 1018 (10th Cir. 2014) (internal quotations omitted). The plaintiff must show from the

text of the law and from actual fact that substantial overbreadth exists. *Harmon v. City of Norman*, 981 F.3d 1141, 1153 (10th Cir. 2020).

Facial challenges, however, are disfavored because they often rely on speculation, run contrary to the principle of judicial restraint, and frustrate the intent of elected representatives. *Washington State Grange*, 552 U.S. at 450-51. The Tenth Circuit has said that a facial challenge "is best understood as a challenge to the terms of the statute, not hypothetical applications," and is resolved "by applying the relevant constitutional test to the challenged statute without attempting to conjure up whether or not there is a hypothetical situation in which application of the statute might be valid." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 917 (10th Cir. 2016) (internal quotations omitted).

RGF argues that the disclosure requirements for ad expenditures covered by Section 1-19-26(N)(3)(c) are facially unconstitutional under both traditional facial analysis and the overbreadth doctrine. (Pl.'s Combined Reply 6, ECF No. 80.) The Court's analysis of the Secretary's motion for summary judgment begins with determining the relevant constitutional test for First Amendment challenges to electoral disclosure laws. *See Bonta*, 141 S.Ct. at 2385-87. After setting forth the reasons why exacting scrutiny applies, rather than strict scrutiny, and what the exacting scrutiny standard entails, the Court turns to an explanation of why the Secretary has met the State's burden of showing that Section 1-19-26(N)(3)(c) survives that level of scrutiny. Finally, the Court summarizes why the record before it, construed in RGF's favor, does not support its facial challenge.

## 2. Exacting scrutiny, not strict scrutiny, applies to the CRA's campaign disclosure requirements

Relying on *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), RGF urges the Court to use strict scrutiny, arguing that the disclosure law is a content-based restriction. "Content-based

laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163. A content-based regulation is one that "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* According to RGF, Section 1-19-26(N)(3)(c) is content-based because it targets speech due to the topic discussed – mentioning a candidate or ballot question close to an election.

*Reed*, however, is not a disclosure law case. Using strict scrutiny, the Supreme Court in *Reed* struck down an ordinance that imposed more stringent restrictions on signs directing the public to meetings of a nonprofit group than on signs conveying other messages. *Reed*, 576 U.S. at 159. In the specific context of electoral disclosure laws, Supreme Court and Tenth Circuit precedent forecloses RGF's argument that strict scrutiny applies.

The Supreme Court first enunciated the exacting scrutiny standard in *Buckley*, a campaign finance case, and it continued to invoke it in other election-related settings, such as in *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 366-67 (2010). *Bonta*, 141 S.Ct. at 2383. The Tenth Circuit likewise adheres to this precedent in applying exacting scrutiny to campaign disclosure requirements. *See*, *e.g.*, *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1243 (10th Cir. 2023) ("Reflecting disclosure laws' lighter touch, we review their constitutionality under the 'exacting scrutiny' standard of review."); *Independent Institute v. Williams*, 812 F.3d 787, 792 (10th Cir. 2016) (as to challenges to laws compelling disclosure of donors who make political contributions or expenditures, the government must satisfy exacting scrutiny); *Free Speech v. Federal Election Com'n*, 720 F.3d 788, 792-93 (10th Cir. 2013) (applying exacting scrutiny when analyzing plaintiff's First Amendment challenge to FEC rules and policies implementing disclosure requirements). This Court is not at liberty to buck precedent by

determining that this electoral disclosure law is a content-based restriction requiring strict scrutiny review, so the Court must reject RGF's invitation to do so.

While exacting scrutiny applies based on long-standing precedent, the contours of exacting scrutiny in compelled disclosure cases under the First Amendment was recently clarified by the Supreme Court in *Bonta*. Pre-*Bonta*, under the exacting scrutiny standard, to uphold a disclosure law, there had to be a substantial relation between the sufficiently important governmental interest and the information that must be disclosed. *See Buckley*, 424 U.S. at 64; *Citizens United*, 558 U.S. at 366-67. "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Doe v. Reed*, 561 U.S. 186, 196 (2010) (internal quotations omitted). The Supreme Court in *Bonta* toughened the exacting scrutiny review by adding a narrow tailoring requirement, but it did so with split opinions on the proper standard of review. *See Bonta*, 141 S.Ct. at 2383-84. A closer look at *Bonta* is useful to the analysis here.

In the *Bonta* case, the Supreme Court reviewed a California law that demanded charitable organizations file with the state Attorney General their Schedule B to IRS Form 990, a document that discloses the names and addresses of donors who contributed more than $5,000 in a tax year, or in some cases, who gave more than 2% of an organization's total contributions. *Id.* at 2380. The petitioners, tax-exempt charities subject to the California law, declined to file their Schedule Bs with the State, fearing the risk of reprisals and a drop in contributions caused by donors' loss of anonymity. *See id.* They challenged the disclosure requirement on its face and as applied to them on First Amendment grounds. *Id.* A majority of the Supreme Court concluded that California's blanket demand for Schedule Bs from charitable organizations was facially unconstitutional. *Id.* at 2385, 2391.

In so holding, the three-Justice plurality of Justices Roberts, Kavanaugh, and Barrett confirmed once more that the standard of review for First Amendment challenges to compelled disclosure is "exacting scrutiny." *Bonta*, 141 S.Ct. at 2383. They clarified, however, that exacting scrutiny review in this context requires not only a substantial relation between the law and a sufficiently important government interest, but also that the disclosure regime must "be narrowly tailored to the government's asserted interest." *Id.* Justice Thomas concurred that California's disclosure requirement violated the First Amendment, but he would have used strict scrutiny review. *Id.* at 2389-90. Justices Alito and Gorsuch concluded that California's law failed both exacting scrutiny and strict scrutiny, so it was unnecessary to decide which standard should be applied in the case or whether the same level of scrutiny should apply in all First Amendment compelled disclosure cases. *Id.* at 2391-92. Although they declined to decide which standard, Justices Alito and Gorsuch agreed "that the exacting scrutiny standard drawn from our election-law jurisprudence has real teeth" and "requires both narrow tailoring and consideration of alternative means of obtaining the sought-after information." *Id.* at 2391. Consequently, a majority agreed that the standard for disclosure laws in the election-law context requires narrowly tailoring. *See id.* at 2385, 2390-91.

Following *Bonta*, the Tenth Circuit in *Wyoming Gun Owners* determined that the Supreme Court, having declined to overturn precedent, continues to apply the exacting scrutiny standard to campaign disclosure laws, but with a more stringent review. *Wyoming Gun Owners*, 83 F.4th at 1244. Accordingly, the government must demonstrate a substantial relation between a disclosure law's burden and an important governmental interest, and that the law is "narrowly tailored to the government's asserted interest." *Id.* (quoting *Bonta*, 141 S. Ct. at 2383). This inquiry requires a court to consider "the extent to which the burdens are unnecessary," *id.*

(quoting *Bonta*, 141 S. Ct. at 2385), viewing whether less drastic means may achieve the same basic purpose, *id.* (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

Applying exacting scrutiny here, this Court explains in Subsection (a) how the Secretary demonstrated a substantial relation between the CRA's disclosure burdens and an important governmental interest. Subsection (b) lays out how the CRA is narrowly tailored to the informational interest.

### a. The Secretary has shown a substantial relation to an important governmental interest

RGF argues that the State does not have an important interest in informing the public of the donors of issue advocacy. According to RGF, there is no important informational interest in the disclosure of donors funding ads that simply mention, but do not advocate for or against, a candidate or ballot question. RGF further asserts that, even if the State has such an interest, Section 1-19-26(N)(3)(c) does not further that interest. In this subsection, the Court will first address the strength of the informational interest before turning to the fit between the CRA and the interest.

### 1) New Mexico has a sufficiently important interest in Section 1-19-26(N)(3)(c)

Section 1-19-26(N)(3)(c) defines an "independent expenditure" as an expenditure that pays for an advertisement that "refers to a clearly identified candidate or ballot question." Communications that do not expressly advocate for the election or defeat of a clearly identified candidate or ballot issue are issue advocacy, not express advocacy. *See Federal Election Com'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 456-57, 469-71 (2007) (describing campaign speech or its functional equivalent as express advocacy while speech about public issues or speech that mention a candidate for office is issue advocacy). RGF's Freedom Index, a scorecard

about specific legislators' votes, mentions incumbent legislators by name, but does not exhort the public to vote for or against a specific candidate. The scorecard thus constitutes issue advocacy. Consequently, RGF's ads and other ads Section 1-19-26(N)(3)(c) targets constitute informational issue advocacy. *Cf. id.* at 470, 476 (discussing how ads that support or oppose legislation and urging citizens to contact their representative are issue advocacy, because the ads are something other than an appeal to vote for or against a specific candidate); *Delaware Strong Families v. Attorney Gen. of Delaware*, 793 F.3d 304, 309 (3d Cir. 2015) ("By selecting issues on which to focus, a voter guide that mentions candidates by name and is distributed close to an election is, at a minimum, issue advocacy.").

The Secretary asserts that the State has an important interest in disclosing the funders of large advertisements about candidates and ballot measures shortly before an election, even when those advertisements constitute issue advocacy, because it helps the electorate make informed decisions and give proper weight to different speakers and messages that are trying to influence an election. RGF asserts that the informational interest does not reach issue advocacy that is not advocating for or against a candidate or ballot question. Relying on *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), RGF contends disclosure of donors funding issue advocacy "adds little, if anything, to the reader's ability to evaluate the document's message," *id.* at 348-49. RGF's reliance on *McIntyre*, however, is misplaced, as a review of the case law reveals.

In *McIntyre*, the Supreme Court considered an Ohio elections law that prohibited the distribution of anonymous campaign documents designed to influence voters in an election and that required written documents covered by the statute to contain "the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes, or is responsible therefor." *Id.* at 336, 338 n.3, 344-45 (quoting

Ohio Rev. Code Ann. § 3599.09(A) (1988)). Applying exacting scrutiny, the Court said that the law would be valid "only if it is narrowly tailored to serve an overriding state interest." *Id.* at 347. In analyzing the interest in informing the electorate of the required information, the *McIntyre* Court found the stated interest "plainly insufficient to support the constitutionality of its disclosure requirement" because the "simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *Id.* at 348. As the Supreme Court further explained, "in the case of a handbill written by a private citizen who is not known to the recipient, the name and address of the author add little, if anything, to the reader's ability to evaluate the document's message." *Id.* at 348-49.

The context of *McIntyre* – the in-person distribution of a handbill – is distinct from the expenditure disclosures implicated in this case. The Supreme Court has repeatedly indicated, pre- and post-*McIntyre*, that the government has an interest in disclosures of contributions designed to influence elections. *See Citizens United*, 558 U.S. at 371 (stating that transparency through disclosures of expenditures "enables the electorate to make informed decisions and give proper weight to different speakers and messages"); *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978) ("Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected"). In *Citizens United*, the Supreme Court recognized a governmental interest in providing "the electorate with information about the sources of election-related spending" to "help citizens make informed choices in the political marketplace." 558 U.S. at 367 (internal quotation marks omitted).

The Supreme Court's reasoning in *Citizens United* is instructive as to the reach of the informational interest to issue advocacy. There, the plaintiff, a nonprofit corporation who released a documentary about then-Senator Hillary Clinton (who was a candidate in the Democratic Party's 2008 Presidential primary elections) intended to release broadcast and cable television advertisements for the movie, including a short and pejorative statement about Senator Clinton. 558 U.S. at 319-20. Citizens United challenged the constitutionality of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), arguing that the prohibition on corporations from using general treasury funds to make independent expenditures that expressly advocate the election or defeat of a candidate was unconstitutional as applied to the *Hillary* movie, and that BCRA's disclaimer and disclosure requirements were unconstitutional as applied to the movie and its advertisements. *See id.* at 320-21. After concluding that the Government cannot suppress political speech based on the speaker's corporate identity, the Supreme Court struck down BCRA's restrictions on corporate independent expenditures. *Id.* at 365. It then turned to the as-applied challenges to the disclaimer and disclosure requirements, the latter of which required any person spending more than $10,000 on electioneering communications in a calendar year to file a disclosure statement with the FEC that identified the person making the expenditure, the expenditure amount, the election to which the communications were directed, and the names of certain contributors. *See id.* at 366.

Because disclaimer and disclosure requirements do not impose a ceiling on campaign-related activities, the Supreme Court said such requirements are subject "to 'exacting scrutiny,' which requires a "substantial relation" between the disclosure requirement and a "sufficiently important" governmental interest." *Id.* at 366-67 (quoting *Buckley*, 424 U.S. at 64). *Citizens United* thus clarified that in the electoral disclosure context, the exacting scrutiny standard this

Court must use in analyzing compelled disclosure regimes requires that the informational interest be sufficiently important, not "overriding", as in *McIntyre*. Notably, the *Citizens United* Court did not analyze *McIntyre* when discussing the disclaimer and disclosure provisions, suggesting the *McIntyre* analysis has limited application to compelled disclosure laws. *See id.* at 368-69. *See also Gaspee Project v. Mederos*, 13 F.4th 79, 93 (1st Cir. 2021) ("The fact that the Court did not adopt the *McIntyre* framework in the election-law context speaks eloquently to its inapplicability.").

With respect to its as-applied challenge to BCRA's compelled disclosure requirements, Citizens United disputed that an informational interest justified the required disclosures for its commercial advertisements, which attempted to persuade viewers to see the film. *See Citizens United*, 558 U.S. at 367-69. The Supreme Court rejected Citizens United's argument and upheld the disclosure provisions. *See id.* at 368-70. It concluded that "the public has an interest in knowing who is speaking about a candidate shortly before an election," an interest that alone was sufficient to justify the application of the disclosure provision to the ads. *Id.* at 369. Significantly for purposes here, although the ads fell within the federal definition of an "electioneering communication," *see id.* at 368, the Supreme Court "reject[ed] Citizens United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy," *id.* at 369.

Circuit courts have construed this language in *Citizens United* as signifying that its holding is not limited to political advertising that is the functional equivalent of a federal electioneering communication and have extended *Citizens United* to some forms of issue advocacy before an election. *See*, *e.g.*, *Gaspee Project v. Mederos*, 13 F.4th 79, 86 (1st Cir. 2021) ("In the election context, the Supreme Court has rejected the attempt to distinguish

between express advocacy and issue advocacy when evaluating disclosure laws — even though the Court has deemed such a distinction relevant when evaluating limits on expenditures.") (citing *Citizens United*, 558 U.S. at 368-69); *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 480 (7th Cir. 2012) (explaining that educating voters on the source of messages promoting or opposing ballot measures is important to help average citizens figure out which interest groups pose the greatest threats to their self-interest). As the First Circuit explained, there is a sufficiently important interest in identifying the speakers behind politically oriented messages, to give the public information on identifying whether and how money is talking in elections. *See Gaspee Project*, 13 F.4th at 87-88.

Where issue speech mentions a candidate shortly before an election, the Tenth Circuit has upheld disclosure requirements when they are sufficiently well-tailored. *See Independence Institute v. Williams*, 812 F.3d 787, 792 (10th Cir. 2016). In *Independence Institute*, within sixty days of the gubernatorial election, the plaintiff intended to run a television advertisement supporting an audit of the state's health care exchange and urging voters to call the governor to tell him to support legislation for the audit. *Id.* at 790. The Institute was concerned that the ad qualified as an "electioneering communication" under the Colorado Constitution, subjecting it to reporting requirements. *Id.* at 789.  Colorado requires any person who spends $1,000 per year on "electioneering communications" to disclose the name, address, and occupation of any person who donated $250 or more when the person specifically earmarked the donations for electioneering communications. *See id.* at 789 & n.1. According to the Colorado Constitution, "'electioneering communication' is defined as 'any communication broadcasted by television or radio' that 'unambiguously refers to any candidate' 'sixty days before a general election' and targets 'an audience that includes members of the electorate for such public office.'" *Id.* at 789-

90 (quoting Colo. Const. art. XXVIII, §2(7)(a)). The Institute argued that the State cannot subject genuine issue advocacy to disclosure requirements, even ads which mention a candidate during a campaign season. *Id.* at 792. The Tenth Circuit rejected the Institute's position based on Supreme Court case law: "the cases hold that television advertisements that mention candidates shortly before elections *can be* considered sufficiently related to campaigns to fall under permissible disclosure regimes—regimes whose precise requirements are cabined within the bounds of exacting scrutiny." *Id.* (italics in original). It further explained: "The logic of *Citizens United* is that advertisements that mention a candidate shortly before an election *are* deemed sufficiently campaign-related to implicate the government's interests in disclosure." *Id.* at 796. The Tenth Circuit upheld Colorado's disclosure requirements, concluding they were sufficiently drawn to serve the public's informational interest in knowing who is speaking about a candidate shortly before an election. *Id.* at 798-99.

In light of *Citizens United* and *Independence Institute*, there is an important informational interest in the disclosure of donors who fund ads that mention a candidate shortly before an election.

RGF nevertheless points out that the Tenth Circuit treats the public interest in knowing who is spending and receiving money to support or oppose a ballot issue differently. Relying on *Sampson v. Buescher*, RGF argues that the informational interest in disclosure with respect to ballot-issue campaigns has "some value, but not that much," *see Sampson v. Buescher*, 625 F.3d 1247, 1257 (10th Cir. 2010).

The Tenth Circuit's analysis for disclosure laws in the ballot-question context is somewhat different from the candidate context, as a comparison of the Tenth Circuit's approach in *Independence Institute* (ad mentioning candidate) versus *Sampson* (speech mentioning ballot

initiative) reveals. In *Sampson*, the plaintiffs were residents of a neighborhood who raised money to oppose an annexation initiative of their neighborhood into the Town of Parker. *Sampson*, 625 F.3d at 1249. They challenged Colorado's disclosure requirements, arguing that they unconstitutionally burdened their First Amendment right to association. *Id.* The Tenth Circuit determined that the State's informational interest in knowing who was spending money to oppose a ballot measure was minimal where the group received $782.02 in nonmonetary contributions (and a total of $2,239.55 in monetary and non-monetary contributions) and spent $1,992.37 to oppose the annexation initiative. *See Sampson*, 625 F.3d at 1252, 1260 n.5; *accord Coalition for Secular Government v. Williams*, 815 F.3d 1267, 1276 (10th Cir. 2016). According to the Tenth Circuit, the informational interest diminishes substantially as the amount of monetary support a donor gives falls to a negligible level. *Sampson*, 625 F.3d at 1259-60. It explained that "this interest is significantly attenuated when the organization is concerned with only a single ballot issue and when the contributions and expenditures are slight." *Id.* at 1259. In finding a violation of the First Amendment, the Tenth Circuit explained: "the financial burden of state regulation on Plaintiffs' freedom of association approaches or exceeds the value of their financial contributions to their political effort; and the governmental interest in imposing those regulations is minimal, if not nonexistent, in light of the small size of the contributions." *Sampson*, 625 F.3d at 1261.

Subsequently, in *Coalition for Secular Government v. Williams*, decided by the Tenth Circuit after *Independence Institute*, the Circuit once again used *Sampson*'s sliding-scale approach. *See Williams*, 815 F.3d at 1277-78. *Williams* involved an appeal of a district court order enjoining Colorado's Secretary of State from enforcing Colorado's issue-committee registration and disclosure requirements against a nonprofit corporation that was planning to

advocate against a statewide ballot initiative in the upcoming election. *Id.* at 1269. The Tenth Circuit determined that "the governmental interest in issue-committee disclosures remains minimal where an issue committee raises or spends $3,500" for a statewide ballot initiative. *Id.* at 1278.

Why does the Tenth Circuit use the sliding-scale approach in *Sampson/Williams* but not *Independence Institute*? Because of the absence of any risk of quid pro quo corruption in the ballot initiative context, the "legitimate reasons for regulating candidate campaigns apply only partially (or perhaps not at all) to ballot-issue campaigns." *Sampson*, 625 F.3d at 1255. In contrast to a ballot initiative, where the issue is the approval or disapproval of discrete governmental action, candidate elections require a voter to "evaluate a human being, deciding what the candidate's personal beliefs are and what influences are likely to be brought to bear when he or she must decide on the advisability of future governmental action." *Id.* at 1256-57.

Nevertheless, *Sampson* and *Williams* do not take RGF as far as it needs to go to succeed on its facial challenge. The Tenth Circuit did not find that no informational interest exists in the ballot context; rather, it assumed "that there is a legitimate public interest in financial disclosure from campaign organizations." *Id.* at 1259. In ballot-initiative disclosure cases in the Tenth Circuit, the strength of the government's informational interest in issue speech increases as the amount of monetary spending on the advertising increases. *See Williams*, 815 F.3d at 1278 ("the strength of the public's interest in issue-committee disclosure depends, in part, on how much money the issue committee has raised or spent"). The Tenth Circuit in *Sampson* and *Williams* acknowledged an informational interest in the identities of donors supporting or opposing ballot initiatives close to an election for cases involving larger scale committees and expenditures. *See Williams*, 815 F.3d at 1280 (recognizing Colorado's issue-committee framework "is much more

justifiable for large-scale, bigger-money issue committees"); *Sampson*, 625 F.3d at 1261 (after saying that it would "not attempt to draw a bright line below which a ballot-issue committee cannot be required to report contributions and expenditures," the Tenth Circuit noted that the case before it was quite different from "ones involving the expenditure of tens of millions of dollars on ballot issues"). Consequently, the Secretary has shown an important State interest in informing voters about who is making large expenditures on ballot-initiative advertisements close in time to an election. The Court therefore rejects RGF's argument that that there is no important governmental interest in informing the public of the donors of issue advocacy in the ballot initiative context.

RGF next argues that, even assuming an informational interest exists generally for issue advocacy, there is no important interest in the disclosure of donors funding ads covered by Section 1-19-26(N)(3)(c), which merely mention a candidate or ballot initiative. RGF argues that *Citizens United* does not extend to the issue advocacy implicated in this case, because the CRA's definitional structure limits the scope of Section 1-19-26(N)(3)(c) to ads that are not for a "political purpose" and that simply mention, but do not explicitly or implicitly advocate for or against, a candidate or ballot question. The Court disagrees with RGF's reading of the statute and of *Citizens United*.

The CRA defines an "expenditure" as a "payment, transfer or distribution … for a political purpose." N.M. Stat. Ann. § 1-19-26(M). "Political purpose" under the Act "means for the purpose of supporting or opposing a ballot question or the nomination or election of a candidate." *Id.* § 1-19-26(S). According to RGF, applying "political purpose" to Section 1-19-26(N)(3)(c) would be self-contradictory, because it covers independent expenditures for ads that only mention a candidate or ballot question. The Secretary disagrees, asserting that the

"independent expenditure" definition contains a "political purpose" requirement incorporated through the definition of expenditure.

Turning, then, to the CRA's definition of "independent expenditure," it is an expenditure that pays for ads that expressly advocate for the election or defeat of a clearly identified candidate or ballot question, N.M. Stat. Ann. § 1-19-26(N)(3)(a); or that are susceptible of no other reasonable interpretation than as an appeal to vote for or against a clearly identified candidate or ballot question, *id.* § 1-19-26(N)(3)(b); or that refer to a clearly identified candidate or ballot question and are published "to the relevant electorate in New Mexico within thirty days before the primary election or sixty days before the general election at which the candidate or ballot question is on the ballot," *id.* § 1-19-26(N)(3)(c). The Court disagrees with RGF that this latter subsection is contradictory to the "political purpose" definition, precluding its incorporation thereof. An ad may refer to a candidate or ballot question, without being so overt as to constitute express advocacy or its functional equivalent, but still have been published for the purpose of supporting or opposing a ballot question or the nomination or election of a candidate. The Court therefore agrees with the Secretary that the most logical way of interpreting the CRA is that the "independent expenditure" definition incorporates the meaning of an "expenditure," i.e., a payment "for a political purpose."

The timing of the expenditures on ads shortly before an election indicate the political purpose of such ads. Relying on *Citizens United*, the Tenth Circuit explained that advertisements such as those in Section 1-19-26(N)(3)(c), which mention a candidate shortly before an election, are sufficiently campaign-related to implicate the government's interests in disclosure. *See Independence Institute*, 812 F.3d at 796. RGF nonetheless argues that *Independence Institute* is distinguishable because the communications at issue there specifically urged voters to support an

audit of Colorado's health benefits exchange, whereas here, the communications cover expenditures that merely mention a candidate or ballot initiative. While acknowledging that the ad advanced an opinion about a public policy issue, the Tenth Circuit explained that "Supreme Court precedent allows limited disclosure requirements for certain types of ads prior to an election *even if the ads make no obvious reference to a campaign*." *Id.* at 791 (emphasis added). The informational issue supporting the disclosure regime in *Independence Institute* was the public's interest in knowing who is speaking about a candidate shortly before an election, and that same interest is applicable here where the CRA applies to ads mentioning a candidate or ballot question shortly before an election. *See id.* at 798.

For all the foregoing reasons, the Secretary has demonstrated a sufficiently important interest in the disclosure of donors spending large amounts funding ads covered by Section 1-19-26(N)(3)(c). *See Citizens United*, 558 U.S. at 371 ("The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."). The Court now turns to the question of the fit between the important interest and the burdens.

### 2) Section 1-19-26(N)(3)(c) is substantially related to New Mexico's important informational interest

To withstand exacting scrutiny, the strength of New Mexico's interest must reflect the seriousness of the actual burden on First Amendment rights. *Reed*, 561 U.S. at 196. The Court thus must measure the State's informational interest against the CRA's disclosure burdens. *Williams*, 815 F.3d at 1278. RGF asserts that Section 1-19-26(N)(3)(c) is not substantially related to the State's interest in informing the electorate as to who is spending money to influence an election. RGF additionally argues that the burdens of the risk of chilled speech outweigh the

legislative interests. The Court addresses the fit between the interest and disclosure burdens before turning to the arguments regarding chilled speech.

a) **The strength of New Mexico's informational interest reflects the seriousness of the disclosure burdens**

RGF contends that the fact that CRA covers general fund donors is problematic because there is a weak fit between the disclosure burdens for those donors and the informational interest. RGF asserts that donors to the general fund may not actually support the ad, but the law scoops them into disclosure anyway. The Tenth Circuit in *Independence Institute* found it important to the substantial relation inquiry that Colorado law required the disclosure only of donors who specifically earmarked their contributions for electioneering purposes. *See Independence Institute*, 812 F.3d at 797. The Court is not convinced, however, that there is a weak fit between the disclosure requirements for the general fund and the informational interest, because other provisions in the CRA tighten the fit.

Under the CRA, only donors who gave more than $5,000 during the election cycle must be reported, thus targeting only large donors. While alone such disclosures may not capture those donors with a financial interest in the ads themselves, the CRA also has an opt-out provision whereby donors of more than $5,000 to the general fund can avoid their disclosure by submitting a written request that their contribution not be used for independent expenditures. *See* N.M. Stat. Ann. § 1-19-27.3(D)(2). The opt-out provision enhances the fit between the disclosures of general-fund donors and the public's informational interest.

RGF next asserts that the CRA "does not have any floor," burdening small organizations making minimal independent expenditures by exposing the private information of their supporters. The CRA, however, does have a minimum monetary threshold: Section 1-19-27.3(A)(1) imposes reporting obligations for organizations only when independent expenditures

exceed $3,000 in a statewide election or $1,000 in a non-statewide election. N.M. Stat. Ann. § 1-19-27.3(A). For groups meeting the $3,000/$1,000 threshold but spending less than $9,000 in a statewide election or $3,000 in a non-statewide election, the groups must disclose the name, address, and amount of contribution for each person who contributed more than $200 in an election cycle "that were earmarked or made in response to a solicitation to fund independent expenditures." N.M. Stat. Ann. § 1-19-27.3(C). For groups spending over the $9,000/$3,000 levels, the disclosures of donors of over $5,000 to the general fund, discussed above, apply. *See id.* § 1-19-27.3(D)(2).

RGF nevertheless argues that these levels capture organizations making minimal independent expenditures, so the informational interest is too low to justify the burdens. The minimum levels, however, roughly correspond to levels set in Colorado's Constitution (requiring persons who annually spend $1000 or more to disclose donors of $250 or more), which the Tenth Circuit upheld in *Independence Institute*. 812 F.3d at 789, 798-99. As the Tenth Circuit explained:

> It is not surprising, however, that a disclosure threshold for state elections is lower than an otherwise comparable federal threshold. Smaller elections can be influenced by less expensive communications. The Secretary has thus shown that Colorado's spending requirements are sufficiently tailored to the public's informational interests.

*Id.* at 798-99. The Tenth Circuit has rejected like arguments that a state disclosure statute operating at these amounts is supported by a minimal informational interest. *See id.* at 797-99; *Wyoming Gun Owners*, 83 F.4th at 1246-47 (concluding that Secretary demonstrated substantial relation between Wyoming's disclosure requirements and informational interest, as applied to plaintiff, where plaintiff reported annual budget somewhere between $50,000 and $100,000, and Wyoming law did not set terribly low disclosure trigger (unlike the $20 amount in *Sampson*)

where it required reporting donors whose contributions exceed $100). *See also Gaspee Project*, 13 F.4th at 82, 88 (reviewing Rhode Island's disclosure regime in its Independent Expenditures and Electioneering Communications Act and concluding that its spending threshold of $1000 or more on independent expenditures within one calendar year "tailors the Act to reach only larger spenders in the election arena and at the same time shapes the Act's coverage to capture organizations involved in election-related spending as opposed to those engaged in more general political speech").

RGF asserts, nonetheless, that the same analysis cannot support disclosures for donors funding ads mentioning a ballot question, because the informational interest is even weaker. Unlike in *Bonta*, where the Supreme Court found that the weakness of the State's interest in administrative convenience was present in every case, the Tenth Circuit has said "there is an informational interest" in issue-committee financial disclosures, but it applies a sliding-scale to determine the strength of that informational interest. *See Williams*, 815 F.3d at 1278; *Sampson*, 625 F.3d at 1261. The monetary thresholds in the CRA exceed those at issue in *Williams*, where the Tenth Circuit declined an invitation to rule on the facial validity of the threshold. *See Williams*, 815 F.3d at 1271, 1275, 1280 ($200 threshold for issue-committee registration and reporting, and once registered, issue committee must report contributions received, including name and address of each person who has contributed $20 or more). The Tenth Circuit has not said that the State categorically has a negligible interest at the minimum thresholds set in the CRA. But even if the State's informational interest is low at the $3,000/$1,000 and $9,000/$3,000 ends of the scale, the interest increases as independent expenditures increase. The Secretary has thus shown an important informational interest in the disclosure of donors who

fund large-dollar expenditures on ballot issues, and that the minimum expenditure amounts further that interest.

Additionally, temporal limitations in the CRA tighten the fit to the informational interest. Section 1-19-26(N)(3)(c) requires disclosure for communications that refer to a "clearly identified candidate or ballot question" within 30 days of a primary election and 60 days of a general election. These limitations create a substantial fit between the disclosures and the governmental interest. *Cf. Independence Institute*, 812 F.3d at 797 (concluding that Colorado's disclosure requirements were sufficiently tailored to meet exacting scrutiny where they applied only to communications referring to a candidate within 30 days of a primary election or 60 days of a general election); *Gaspee Project*, 13 F.4th at 88 ("The fact that the Act only applies when an organization crosses the spending threshold and spends that money in a particular time frame — within one year of an election for independent expenditures and, for electioneering communications, within either thirty or sixty days of an election (depending on the type) — links the challenged requirements neatly to the Board's objective of securing an informed electorate.").

Also serving to create a close fit to the interest is the limitation in the CRA targeting ads that are "published and disseminated to the relevant electorate in New Mexico." N.M. Stat. Ann. § 1-19-26(N)(3)(c). This limitation thus focuses disclosures on those funders of expenditures designed to influence the relevant electorate. Covered organizations are thus "free to speak without disclosure when addressing audiences disconnected from the upcoming election." *Gaspee Project*, 13 F.4th at 89.

In sum, the aforementioned provisions in the CRA serve to match the burdens with New Mexico's informational interest. RGF nonetheless argues that SB 3 creates an unnecessary risk

of chilling in violation of the First Amendment. The Court turns to that argument in the next subsection.

> **b)  There is too little evidence of chilled speech to overcome New Mexico's informational interest in Section 1-19-26(N)(3)(c)**

Disclosure requirements may deter contributions or expenditures from persons who prefer to remain anonymous, and they can chill donations to an organization by exposing donors to retaliation. *See Madigan*, 697 F.3d at 482. General concerns, however, do not de facto invalidate every disclosure law; rather, a court must carefully consider the evidence of chilled speech and weigh the burdens against the legislative interests. *See Buckley*, 424 U.S. at 68-74. To show such a risk of chilled speech, a party need only show "a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.* at 74.

RGF asserts that SB 3's disclosure requirements impose a substantial burden on its First Amendment rights "because the loss of donor support is real." (Pl.'s Mot. 11, ECF No. 76.) RGF's cited record evidence for the loss of donor support is that RGF fears that if its donors are disclosed, they may be subject to retaliation and harassment by intolerant members of society, or some donors may stop contributing to RGF out of fear of retaliation and harassment by intolerant members of society. (*See* Gessing Decl. ¶¶ 10, 22, ECF No. 33-2.). RGF's president is personally aware of instances where donors to organizations with similar views were subject to retaliation and harassment, including boycotts, online harassment, and social ostracism. (Gessing Decl. ¶ 10, ECF No. 33-2.) Based on Mr. Gessing's fundraising experience, he believes that RGF's potential donors will be less likely to contribute to its mission if their identities are disclosed. (Gessing Decl. ¶ 11, ECF No. 33-2.) RGF's president knows of several donors who support RGF that would not continue to do so if they were subject to disclosure. (*Id.*) RGF admits, however,

that it is not aware of any harassment or retaliation of its employees or donors in its over 20-year history. (*See* Pl.'s Combined Reply 4, ECF No. 80.)

Even viewing the evidence in RGF's favor, this evidence is insufficient to establish a reasonable probability that the compelled disclosures required by SB 3 will subject RGF and similar organizations to threats, harassment, or reprisals from either Government officials or private parties to justify invalidating the law in this facial challenge. *See Madigan*, 697 F.3d at 482-83 (treating burdens of potential loss of donors and chilling effect as "modest" where plaintiff provided scant evidence, beyond bare speculation, that disclosure law would be at all likely to precipitate threats, harassment, or reprisals against it or other similarly situated advocacy groups). *Cf. Citizens United*, 558 U.S. at 370 ("Citizens United argues that disclosure requirements can chill donations to an organization by exposing donors to retaliation. Some *amici* point to recent events in which donors to certain causes were blacklisted, threatened, or otherwise targeted for retaliation….The examples cited by *amici* are cause for concern. Citizens United, however, has offered no evidence that its members may face similar threats or reprisals. To the contrary, Citizens United has been disclosing its donors for years and has identified no instance of harassment or retaliation."); *Buckley*, 424 U.S. at 69-72 (explaining that substantial public interest in disclosure identified by legislative history of Act outweighed harm generally alleged by minor parties where they relied on clearly articulated fears of individuals and testimony of several minor-party officials that one or two persons refused to make contributions because of possibility of disclosure).

Nevertheless, RGF asserts that, in accordance with *Bonta*, the unnecessary risk of chilling effect on associations is enough to invalidate Section 1-19-26(N)(3)(c). To the contrary, a comparison of *Bonta* highlights the insufficiency of the record in this case to invalidate the law.

The Supreme Court in *Bonta* had a developed record of the burdens the law placed on 60,000 charities and the failure of the Attorney General's office to use the collected information in California's fraud detection efforts. *See Bonta*, 141 S.Ct. at 2386. The record showed specific threats and harassment to the plaintiff as well as fears from hundreds of organizations that filed amicus briefs. *See id.* at 2381, 2388. Additionally, based on the record evidence, the district court found that there was not a single, concrete instance where the disclosures were used by the State to enhance its purported interest in protecting the public from fraud through investigative, regulatory, or enforcement efforts. *Id.* at 2386.

In contrast, the Court here does not have a comparable record, even construing the evidence in RGF's favor, from which a trier of fact could find that there is a reasonable probability that RGF or other advocacy groups in New Mexico would face threats, harassment, or reprisals from CRA's disclosure requirements that would outweigh the State's important interest in disclosure. Moreover, here, it is undisputed that the independent expenditure reports are public and accessible in searchable format on the internet. (*See* Pl.'s UF ¶ 12, ECF No. 76; Def.'s Resp. ¶ 12, ECF No. 79 at 13 of 39.) Consequently, the record shows, unlike in *Bonta*, that the State is using the disclosures to enhance its asserted interest.

For all the foregoing reasons, the Secretary has shown a substantial relation between SB 3's disclosure provisions and New Mexico's important informational interest.

### b.  Narrow tailoring

Next, the Secretary must show that the CRA's disclosure requirements are narrowly tailored to serve the informational interest. *See Wyoming Gun Owners*, 83 F.4th at 1247. To establish that the disclosure law is narrowly tailored, "the government must 'demonstrate its need' for the disclosure regime 'in light of any less intrusive alternatives.'" *Id.* (quoting *Bonta*,

141 S. Ct. at 2386). A court must "consider 'the extent to which the burdens are unnecessary.'"
*Id.* at 1244 (quoting *Bonta*, 141 S. Ct. at 2385).

RGF argues that the law is not narrowly tailored to the interest in knowing who is
supporting or opposing a candidate or ballot issue, because it covers ads that merely mention a
candidate or ballot question. The Secretary relies on multiple features of the CRA – temporal
limitations, monetary thresholds, and opt-out provisions – to demonstrate that the law is
narrowly tailored to the informational interest of knowing who is funding large advertisements
for candidates or ballot initiatives before an election. As discussed *supra*, the Court agrees that
the monetary thresholds avoid targeting small-scale organizations spending too little and having
too little influence to support a public informational interest. Contrary to RGF's contention, the
temporal limitations and the targeting of ads that are disseminated to the relevant electorate tailor
the law to ads that are intended to influence an election.

With respect to the opt-out provision, RGF argues it is not enough to overcome the lack
of tailoring that occurs by requiring the disclosure of the donors to the general fund. It is true that
the Tenth Circuit recently said that "[i]nstituting an earmarking system better serves the state's
informational interest; it directly links speaker to content…." *Wyoming Gun Owners*, 83 F.4th at
1248. But the Tenth Circuit has not held that only donors of earmarked funds may be subject to
disclosure for a disclosure law to survive exacting scrutiny. A closer look at *Wyoming Gun
Owners* reveals that the Tenth Circuit finds opt-out features to be an acceptable means of
tailoring general fund disclosures to the informational interest.

In *Wyoming Gun Owners*, the Tenth Circuit examined Wyoming's campaign finance
disclosure requirements as applied to the Wyoming Gun Owners ("WyGO"), a "mom-and-pop
style" nonprofit gun rights advocacy group that aired a radio ad extolling the pro-gun credentials

of a candidate, while criticizing the opposing candidate, in the run-up to Wyoming's 2020 primary election. 83 F.4th at 1229, 1231. Wyoming's campaign finance law requires organizations spending over $1,000 on an electioneering communication (defined essentially as a message aimed at advocating for or against a candidate or ballot proposition) to "list those expenditures and contributions which *relate to* an independent expenditure or electioneering communication." *See id.* at 1229-31 (quoting Wyo. Stat. § 22-25-106(h)(iv) (emphasis added by Tenth Circuit)). The organization also had to file a statement identifying the name of whoever made the relevant contribution if it exceeded $100. *Id.* at 1247 (citing § 22-25-106(h)(v)).

The Tenth Circuit first concluded that the phrase "relate to" was impermissibly vague and invited arbitrary enforcement as applied to an organization like WyGO that pooled all its donations and whose accounting practices did not allow for earmarking or tracking each dollar spent. *See id.* at 1237-38. Examining the same language to determine if the statute met exacting scrutiny, the Tenth Circuit explained that it burdened advocacy groups like WyGO, which had unsophisticated bookkeeping systems, by creating confusion when they attempted to determine which donor contributions "relate to" a particular payment. *Id.* at 1247. After rejecting the Secretary's solution of requiring the disclosure of all contributions over $100 because it would result in over-disclosure, the Tenth Circuit discussed how an earmarking system could tailor the law to the informational interest and noted that the defendant failed to explain why Wyoming could not institute such a system. *Id.* at 1247-48. Importantly for the analysis here, the Tenth Circuit examined the First Circuit case of *Gaspee Project v. Mederos*, which in turn analyzed a Rhode Island law similar to the CRA:

> Consider *Gaspee Project v. Mederos*, 13 F.4th 79 (1st Cir. 2021). There, the First Circuit found a similar disclosure law narrowly tailored despite the lack of an earmarking provision. And it observed that any donor who wanted to avoid

disclosure could just "contribute less than $1,000" in the covered time frame. *Id.* at 89. That, the Secretary argues, is also an option for Wyoming donors.

We do not understand *Gaspee Project* to be in tension with our analysis. The First Circuit plainly acknowledged the importance of allowing donors to "opt out" of a disclosure scheme while maintaining the ability to speak. *Id.* The absence of an earmarking provision did not matter because "the Act provides ample opportunity for donors to opt out from having their donations used for ... electioneering communications, even if the entity to which they contribute has not created a segregated fund." *Id.* For example, the statute provided guidance for following a specific carve-out procedure so donors could "opt out of having their monies used for ... electioneering communications" and avoid disclosure. *Id.* The Wyoming statute does not offer similar guidance. Furthermore, the First Circuit's suggestion that wary donors should just contribute less than $1,000 strikes us as an unacceptable ask here, where the disclosure requirements trigger at a *$100* donation. § 22-25-106(h)(v).

*Wyoming Gun Owner*s, 83 F.4th at 1249 (internal footnote omitted).

The CRA contains the type of "appropriate and precise guidance" that the Tenth Circuit said was missing in the Wyoming law. Under the CRA, if an organization spends money on independent expenditures for a campaign from a general bank account (not segregated by earmarked donations), the organization is only required to report the name and address of any donor who gave more than $5,000 during an election cycle, thus only targeting large donors. Significantly, contributors of over $5,000 can opt out of this requirement by sending a written notice that the funds should not be used towards independent expenditures. The purpose of the general-fund provision is to help close a loophole whereby large donors could avoid all disclosure by donating only to the general fund. The CRA's opt-out provision creates a tighter fit between donors to the general fund and New Mexico's important informational interest and is narrowly tailored to that interest.

Finally, RGF contends that that the law is underinclusive, because New Mexico does not otherwise require disclosure of donors for issue advocacy except near an election. According to RGF, this underinclusiveness casts doubt on whether the Secretary is pursuing the interest she

invokes and shows a failure to narrowly tailor the law to that interest. The informational interest that the Secretary pursues, however, is the public interest in knowing who is speaking about a candidate or ballot question shortly before an election. Tying the disclosure of donors of ads mentioning a candidate or ballot question close to the election is targeted to that interest to enable voters to have information about who may be attempting to influence the election.

Disclosure requirements are "even more essential and necessary to enable informed choice in the political marketplace following *Citizen United*'s change to the political campaign landscape with the removal of the limit on corporate expenditures." *Free Speech*, 720 F.3d at 798. Generally, "disclosure is a less restrictive alternative to more comprehensive regulations of speech." *Citizens United*, 558 U.S. at 369. Here, the CRA contains provisions that narrowly tailor the law to the public's informational interest. The Secretary has therefore shown that Section 1-19-26(N)(3)(c) satisfies exacting scrutiny.

### c. The Secretary is entitled to summary judgment on RGF's facial challenge

The Secretary has shown that an important informational interest exists for disclosure of donors for large expenditures on candidate and ballot issues near an election, and that the CRA is substantially related to and narrowly tailored to that interest. Consequently, the Secretary has shown on the record construed in favor of RGF that there are circumstances in which the CRA is valid and that it has a legitimate sweep.

To succeed on an overbreadth challenge, RGF may show that a substantial number of Section 1-19-26(N)(3)(c)'s applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep. RGF, however, failed to produce evidence from which the trier of fact could find that facial overbreadth standard met. For example, RGF did not present evidence that most of the organizations engaging in issue advocacy in the 30- to 60-day lead up to New

Mexico elections are small, grassroots organizations who spend near the minimum thresholds. Nor does the Court have before it evidence that there is a reasonable probability that the compelled disclosure of contributors' names to most such small organizations will subject them to threats, harassment, or reprisals from either Government officials or private parties. Accordingly, even construing the record favorably to RGF, RGF cannot succeed on its facial challenge to enjoin enforcement of Section 1-19-26(N)(3)(c). *Cf. Republican Party of New Mexico v. Torrez*, No. 1:11-cv-00900-WJ-KBM, __ F.Supp.3d __, 2023 WL 5310645, at *33 (D.N.M. Aug. 17, 2023) (concluding that CRA's "electioneering communication" definition is neither overbroad nor vague based on *Independence Institute* and *Citizens United*). *See also Madigan*, 697 F.3d at 482-83 (concluding that plaintiff failed to meet burden on facial challenge to Illinois's disclosure regime related to ballot initiatives where plaintiff was national advocacy organization seeking to spread its political messages on a broad scale, which is "the sort of campaign-related advertising about which Illinois has a substantial interest in providing information to its public," and where plaintiff provided "scant evidence" beyond speculation that the law would precipitate threats, harassment, or reprisals against it or other similarly situated advocacy groups). The Secretary is therefore entitled to summary judgment on Count I.

### B.  Plaintiff's Combined Motion for Summary Judgment

On Plaintiff's motion for summary judgment, the Court must construe all facts and reasonable inferences in the light most favorable to the Secretary as the nonmoving party. RGF asserts in its motion for summary judgment that Section 1-19-26(N)(3)(c)'s disclosure requirements fail exacting or strict scrutiny. As discussed *supra*, exacting scrutiny applies to the claim, and to survive exacting scrutiny, the government must demonstrate a substantial relation between a disclosure law's burden and an important governmental interest, and that the law is

narrowly tailored to the government's asserted interest. The Secretary has satisfied that burden when viewing the factual record favorably to RGF. It stands to reason that, in viewing factual inferences favorably to the Secretary, she likewise satisfies the burden to avoid summary judgment. The Secretary has shown, based on the undisputed facts and the factual inferences construed in her favor, that New Mexico has an important interest in informing voters about who is making large contributions to pay for advertisements about candidates and ballot measures shortly before elections; the CRA's disclosure requirements are carefully drafted to fit closely with that interest; and the CRA is narrowly tailored to the important informational interest. RGF failed to produce evidence to support its overbreadth challenge to Section 1-19-26(N)(3)(c). Consequently, RGF is not entitled to summary judgment on Count I.

**IT IS THEREFORE ORDERED** that:

1. Plaintiff's *Combined Motion for Summary Judgment and Memorandum of Law* (**ECF No. 76**) is **DENIED**.

2. Defendant's *Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment* (**ECF No. 79**) is **GRANTED**.

3. Count I, the last remaining count in this case, is **DISMISSED**.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**